725 A.2d 38 (1999)
319 N.J. Super. 148
Charles CEDENO, Plaintiff-Respondent,
v.
MONTCLAIR STATE UNIVERSITY, a corporation of the State of New Jersey, and Raye Jean Mastrangelo, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1998.
Decided March 9, 1999.
*39 Steven J. Zweig, Deputy Attorney General, for defendant-appellant Montclair State University (Peter Verniero, Attorney General, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Mr. Zweig, on the brief).
Howard M. Nirenberg, for defendant-appellant Raye Jean Mastrangelo (Nirenberg & Varano, attorneys; Sandra N. Varano and Mr. Nirenberg, of counsel and on the brief).
John G. Geppert, Jr., for plaintiff-respondent (Wiley, Malehorn and Sirota, attorneys; Mr. Geppert, of counsel; Eugene Huang, Morristown and Arla D. Cahill, Newark, on the brief).
Before Judges SKILLMAN, PAUL G. LEVY and LESEMANN.
The opinion of the court was delivered by SKILLMAN, J.A.D.
The issue presented by this appeal is whether a person who is statutorily disqualified from obtaining public employment as a result of a criminal conviction may maintain an action for an alleged wrongful discharge, in violation of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, or the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. We hold that such an action may not be maintained and consequently reverse the denial of defendants' motions for summary judgment.
Between 1973 and 1979, plaintiff was employed by the Southeastern Pennsylvania Transportation Authority (SEPTA), an agency of the Commonwealth of Pennsylvania, as its Director of Purchasing. On June 10, 1981, a Pennsylvania grand jury returned a presentment recommending that plaintiff be charged with nineteen counts of bribery in official and political matters, in violation of 18 Pa. Cons.Stat. § 4701. This presentment was based on testimony by four vendors that they had paid kickbacks to plaintiff to obtain contracts from SEPTA or to increase the volume of their sales to SEPTA. The total amount of these kickbacks, which were paid over a six year period, exceeded $15,000. Plaintiff was subsequently charged in accordance with this presentment, and on November 9, 1982, he pled nolo contendere to four counts of bribery. The court sentenced defendant to a five year term of probation and a $2,500 fine on one count of bribery and a suspended sentence on the remaining counts.
After plaintiff left his position at SEPTA, he became employed by Fairfax County, Virginia, as Director of its Purchasing and Supply Management Agency. On June 30, 1980, the Fairfax County Board of Supervisors unanimously voted to discharge plaintiff. This discharge was based on a recommendation by the Acting County Executive, who reported that plaintiff "intimidated his staff,... was profane, vulgar and abusive in his speech, ... [and had brought] discredit on himself and discredit and embarrassment to his agency and to the County Government."
In 1986, plaintiff applied for the position of Director of Purchasing at Montclair State University (MSU). The job application form which plaintiff was required to complete asked whether he had any "criminal convictions." In response, plaintiff checked the *40 line which said "No." In response to another question which asked an applicant to set forth the names of prior employers, plaintiff disclosed his employment with SEPTA but did not set forth his employment with Fairfax County. After plaintiff was interviewed by Dr. Barry Cohen, MSU's Assistant Vice President of Administration and Finance, MSU hired him under a one-year employment contract which was subject to renewal on an annual basis.
On November 7, 1989, Dr. Cohen, who was then plaintiff's supervisor, recommended that his employment contract not be renewed. Dr. Cohen submitted a report which stated that "[i]n the past year, Charles' performance has been significantly impaired by repeated instances of poor judgment, inappropriate behavior, and ... a failure to complete a particularly important assignment." However, the President of MSU, who was newly appointed, declined to accept this recommendation because he himself had not yet had an opportunity to evaluate plaintiff.
In March of 1996, plaintiff's new supervisor, defendant Raye Jean Mastrangelo, also recommended that plaintiff not be re-appointed. Mastrangelo cited numerous deficiencies in plaintiff's job performance, including his failure to maintain a cooperative relationship with other units of the University; unauthorized use of a cellular phone; excessive use of the E-mail system; failure to establish an effective property control system; inappropriate behavior towards his supervisor; adversarial interactions with colleagues; unscheduled absences; and forcing the use of certain vendors who were neither cost beneficial nor convenient. The President of MSU concurred with this recommendation and plaintiff's employment contract expired on June 30, 1996.
Prior to the termination of his employment, plaintiff filed an internal complaint with the MSU Equal Opportunity/ Affirmative Action Office alleging that Mastrangelo had harassed him and discriminated against him on the basis of his national origin and ancestry. Based on evidence presented at a fact-finding hearing relating to this complaint, a hearing officer found that "there were deficiencies in [plaintiff's] work performance during the past year," and that his claims of "discrimination, harassment, disparate treatment and retaliation" were "fundamentally without merit." Plaintiff did not appeal this decision to the MSU Board of Trustees or pursue any other avenue of administrative review.
While his internal complaint was still under consideration, plaintiff filed the present action against MSU and Mastrangelo, alleging a retaliatory discharge, in violation of CEPA, and discrimination on the basis of ethnicity and age, in violation of the LAD.[1] Plaintiff also asserted claims for intentional infliction of emotional distress, conspiracy, invasion of privacy and denial of his right to free speech. Although plaintiff was still employed by MSU when the complaint was filed, he alleged that defendants had "begun taking steps to terminate and replace" him.
During discovery, defendants became aware of plaintiff's employment by Fairfax County and his bribery conviction. Consequently, defendants filed motions for summary judgment on the ground that plaintiff's wrongful discharge claims were barred because he was disqualified from public employment pursuant to N.J.S.A. 2C:51-2(d). Defendants also asserted that plaintiff's action was barred under the doctrines of res judicata and collateral estoppel based on the rejection of his internal discrimination and harassment complaint.
The trial court issued a written decision denying defendants' motions. First, the court ruled that plaintiff's claims were not barred under the doctrines of res judicata and collateral estoppel because the hearing at MSU had not "provide[d][him] a `full and fair' opportunity to litigate the matter." Second, the court decided that plaintiff's criminal conviction in Pennsylvania did not bar him from maintaining a wrongful discharge claim because it constituted "after-acquired evidence." The court relied upon cases such as McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed. 2d 852 (1995), which hold that after-acquired evidence is irrelevant in the liability stage of a *41 discrimination case. Although there is no reported decision in this State which has endorsed this rule, the trial court concluded that in view of federal precedent and the important public policies behind the LAD and CEPA, New Jersey would not allow an employer to avoid liability under the these statutes based on after-acquired evidence. The court also stated that it was "tempted to make an exception" to this rule based on plaintiff's disqualification from holding public employment as a result of his criminal conviction as well as his failure to disclose the conviction on his employment application. However, the court concluded that "if such an exception is to be made it has to be made by a higher Court."
Defendants filed motions for leave to appeal from the orders denying their motions for summary judgment. We granted the motions and consolidated the appeals.
We conclude that a person who is statutorily barred from obtaining public employment as a result of a criminal conviction may not maintain an action for an alleged wrongful discharge from that position. Our conclusion that plaintiff is barred from maintaining this action makes it unnecessary to consider defendants' alternative argument that because plaintiff's claims were rejected in the MSU administrative proceeding, he is barred under the doctrines of res judicata and collateral estoppel from pursuing those same claims in this action.
The Supreme Court of New Jersey "has repeatedly emphasized the strong public policy ... against employment discrimination" expressed in the LAD. Andersen v. Exxon Co., 89 N.J. 483, 492, 446 A.2d 486 (1982). The Court has also indicated that CEPA was enacted to effectuate similar "important public policies." Abbamont v. Piscataway Township Bd. of Educ., 138 N.J. 405, 418, 650 A.2d 958 (1994). "Both CEPA and LAD ... seek[ ] to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers." Ibid. In view of the important public policies served by the LAD and CEPA, we have no hesitancy in concluding that an employer ordinarily may not defeat a wrongful discharge claim under either of these statutes simply by showing that the employee made a misrepresentation on an employment application which, if it had been discovered during the employment, would have resulted in the employee's discharge. See Massey v. Trump's Castle Hotel & Casino, 828 F.Supp. 314, 324-25 (D.N.J. 1993) (predicting that Supreme Court of New Jersey would hold that after-acquired evidence of employee misconduct which would have justified discharge does not bar a claim under LAD); In re Jackson, 294 N.J.Super. 233, 237, 683 A.2d 203 (App.Div.1996) (stating in dictum that alleged misconduct of an employee in 1996 was not relevant to a determination of whether his removal from public employment in 1993 violated the LAD), certif. denied, 149 N.J. 141, 693 A.2d 110 (1997); cf. Nicosia v. Wakefern Food Corp., 136 N.J. 401, 417-21, 643 A.2d 554 (1994) (discussing the case law and scholarly commentaries relating to the after-acquired evidence doctrine but declining to pass on its applicability in New Jersey because the issue was not directly presented).[2]
However, this case involves exceptional circumstances. Plaintiff did not simply make a misrepresentation on his employment application which would have provided a basis for his discharge. Instead, as a result of his conviction for bribery, plaintiff was statutorily barred from ever obtaining any public employment in New Jersey.
N.J.S.A. 2C:51-2(d) (formerly N.J.S.A. 2C:51-2(c)) provides in pertinent part that "any person convicted of an offense involving or touching on his public office, position or employment shall be forever disqualified *42 from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions." A conviction for bribery based on acts committed in the course public employment clearly constitutes "an offense involving or touching on [plaintiff's] public office, position or employment," and the position of Director of Purchasing which plaintiff held at MSU constituted a "position of honor, trust or profit under this State." See Moore v. Youth Correctional Inst. at Annandale, 119 N.J. 256, 266, 574 A.2d 983 (1990); Pastore v. County of Essex, 237 N.J.Super. 371, 568 A.2d 81 (App.Div.1989), certif. denied, 122 N.J. 129, 584 A.2d 205 (1990); State v. Musto, 187 N.J.Super. 264, 310, 454 A.2d 449 (Law Div.1982), aff'd, 188 N.J.Super. 106, 456 A.2d 114 (App.Div.1983). Thus, at the time of his application for employment and throughout the course of his employment, plaintiff was absolutely disqualified by statute from holding the position from which he claims to have been discharged in violation of the LAD and CEPA. Consequently, MSU's administrators were prohibited by statute from hiring plaintiff, and if they had become aware of his conviction at any time during his employment, they would have been required to summarily discharge him.[3]
Plaintiff concedes that the disqualification from public employment imposed by N.J.S.A. 2C:51-2(d) would preclude an order mandating his reinstatement to the position of Director of Purchasing even if he could show that his discharge violated the LAD or CEPA. However, plaintiff argues that he is entitled to maintain a claim for back pay for the period between the termination of his employment and MSU's discovery of his criminal conviction. Plaintiff relies upon McKennon v. Nashville Banner Publ'g Co., supra, which held that a discharged employee can maintain an action under the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, even though the employer subsequently discovers evidence which would have provided "lawful and legitimate grounds" for the discharge, and that the employee could seek recovery for "backpay from the date of the unlawful discharge to the date the new information was discovered." 513 U.S. at 362, 115 S.Ct. at 886, 130 L.Ed.2d at 863. The Court stated that "[t]he private litigant who seeks redress for his or her injuries vindicates both the deterrence and the compensation objectives of the ADEA," and concluded that "[i]t would not accord with this scheme if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief from an earlier violation of the Act." 513 U.S. at 358, 115 S.Ct. at 884, 130 L.Ed.2d at 861; see also Wallace v. Dunn Constr. Co., supra, 62 F.3d 374 (holding that the principles set forth in McKennon apply with equal force to actions under Title VII, 42 U.S.C. § 2000e to e-17, and the federal Equal Pay Act, 29 U.S.C. § 206(d)(1)).
However, the Court in McKennon also stated that "[i]n determining the appropriate order for relief, the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party." 513 U.S. at 362, 115 S.Ct. at 886, 130 L.Ed.2d at 863. The Court further observed that "[t]he proper boundaries of remedial relief in the general class of cases where, after termination, it is discovered that the employee has engaged in wrongdoing must be addressed by the judicial system in the ordinary course of further decisions, for the factual permutations and the equitable considerations they raise will *43 vary from case to case." Id. at 361, 115 S.Ct. at 886, 130 L.Ed.2d at 863. Therefore, McKennon does not establish a blanket rule that any plaintiff in a wrongful discharge case brought under federal discrimination laws can maintain a claim for back pay for the period between the discharge and the employer's discovery of wrongdoing which would have provided legitimate grounds for discharge. Instead, McKennon recognizes that courts should consider the equitable circumstances of each individual case.
In this case, the award of back pay to plaintiff for the period of time up to MSU's discovery of his criminal conviction not only would be plainly inconsistent with the legislative directive of N.J.S.A. 2C:51-2(d) that "any person convicted of an offense involving or touching his ... public employment should be forever disqualified" from public employment, but also would be highly inequitable. Due to plaintiff's failure to disclose his criminal conviction on his employment application,[4] he has already received a state salary for ten years. Even assuming that those past salary payments cannot be recouped, any award of back pay for a portion of the period subsequent to plaintiff's discharge would have the inequitable consequence of allowing him to derive additional profit from the misrepresentations on his employment application. Therefore, we are satisfied that this is a case where the effectuation of the legislative policies of N.J.S.A. 2C:51-2(d) and equitable circumstances dictate the denial of any award of back pay.
Furthermore, there is no basis for allowing plaintiff to pursue a claim for any other form of monetary relief. The decision whether to impose monetary liability for an alleged violation of either the LAD or CEPA is "influenced by considerations of public policy." Abbamont v. Piscataway Township Bd. of Educ., supra, 138 N.J. at 417, 650 A.2d 958. In this case the dominant public policy consideration is the legislative mandate of N.J.S.A. 2C:51-2(d) to disqualify any person who has been convicted of an offense involving or touching public employment from any further public employment. In our view, this policy would be seriously undermined if plaintiff were allowed to pursue any form of monetary claim against the State.
We can conceive of other circumstances, such as the aggravated sexual harassment alleged in Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993), where the need to vindicate the policies of the LAD or CEPA and to compensate an aggrieved party for tangible physical or emotional harm could lead to the conclusion that even a person who was absolutely disqualified from holding public employment should be allowed to seek compensation for harm suffered during that employment. However, this is not such a case. Although defendants' motions for summary judgment were based solely on plaintiff's disqualification from public employment and the alleged preclusive effect of the internal hearing before MSU, we are satisfied, based on our own review of substantial excerpts from the depositions in this case and the transcript of the complete hearing before MSU, that even if plaintiff's allegations could be substantiated, there would be no basis for finding the kind of severe physical or emotional harm to plaintiff or aggravated wrongdoing which might warrant an award of monetary relief other than back pay.
Our conclusion that the absolute disqualification from public employment imposed by N.J.S.A. 2C:51-2(d) precludes plaintiff from maintaining a wrongful discharge action under the LAD or CEPA is supported by Camp v. Jeffer, Mangels, Butler & Marmaro, *44 35 Cal.App. 4th 620, 41 Cal.Rptr.2d 329 (1995). The plaintiffs in that case, a husband and wife who had been convicted of conspiracy to use false information to defraud a federally insured bank, falsely stated on their employment applications that they had never been convicted of a felony. Their employer had a contract with a federal agency, the Resolution Trust Company (RTC), which required a certification that none of its employees had been convicted of a felony. Relying upon plaintiffs' employment applications, the employer made this certification to the RTC. After one of the plaintiffs allegedly brought information to the employer's attention concerning insider trading, they were both discharged. Plaintiffs then brought a wrongful discharge action, alleging a "whistleblower" claim based on the insider trading complaint. During pretrial discovery, the employer became aware of plaintiffs' criminal convictions and successfully moved for summary judgment on that basis. Although the California courts had rejected the after-acquired evidence doctrine in other contexts, the court of appeal affirmed the summary judgment on the ground that plaintiffs "were not lawfully qualified for [their] job[s]" because they "misrepresented a job qualification imposed by the federal government." Id. at 338. In distinguishing McKennon, the court stated:
[T]he equities compel a different result where an employee who is disqualified from employment by government-imposed requirements nevertheless obtains a job by misrepresenting the pertinent qualifications.

[Id., 41 Cal.Rptr.2d at 339.]
See also Egbuna v. Time-Life Libraries, Inc., 153 F.3d 184 (4th Cir.1998) (en banc) (holding that an undocumented alien is barred from maintaining an action under Title VII for alleged discrimination in hiring because she is ineligible for employment within the United States), cert. denied, ___ U.S. ___, 119 S.Ct. 1034, 143 L.Ed.2d 43 (1999).
The point is not, as conceived by the dissent, whether the policies expressed in N.J.S.A. 2C:51-2(d) "outweigh[ ] the policies embodied in the [LAD and CEPA]." (dissenting op. at 163, 725 A.2d at 45).[5] Our courts have long recognized that the important public policies underlying the LAD and CEPA require these laws to be liberally construed. See, e.g., Abbamont v. Piscataway Township Bd. of Educ., supra, 138 N.J. at 431, 650 A.2d 958; Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399, 409-13, 301 A.2d 754 (1973); Jackson v. Concord Co., 54 N.J. 113, 122-25, 253 A.2d 793 (1969). However, in construing the LAD and CEPA, as in construing any other legislation, we ultimately must determine the "probable legislative intent" with respect to the specific issue before the court. Young v. Schering Corp., 141 N.J. 16, 25, 660 A.2d 1153 (1995). Civil Rights laws, like all other laws, "must be sensibly and practically applied." Andersen v. Exxon, supra, 89 N.J. at 496, 446 A.2d 486. Moreover, in determining legislative intent, a court should attempt to harmonize the provisions of civil rights laws with other legislative enactments. See Hinfey v. Matawan Reg'l Bd. of Educ., 77 N.J. 514, 391 A.2d 899 (1978). Thus, the question is not whether the policies which underlie N.J.S.A. 2C:51-2(d) are more or less important than the policies embodied in the LAD and CEPA, but rather whether it can reasonably be concluded, in light of N.J.S.A. 2C:51-2(d), that plaintiff must be allowed to pursue a claim for money damages against the State to effectuate the Legislature's intent in enacting the LAD and CEPA.
We are satisfied that it would be beyond the probable legislative intent of the LAD *45 and CEPA to allow a former public employee to seek back pay and related damages based on allegations that he was wrongfully discharged from a position he was statutorily barred from obtaining. We of course recognize that monetary awards under the LAD and CEPA are made not only to compensate the alleged aggrieved party but also to deter conduct that violates the prohibitions of these important laws. See Abbamont v. Piscataway Bd. of Educ., supra, 138 N.J. at 418-21, 429-32, 650 A.2d 958; Lehmann v. Toys `R' Us, Inc., supra, 132 N.J. at 623-25, 626 A.2d 445; see also McKennon v. Nashville Banner Publ'g Co., supra, 513 U.S. at 358-59, 115 S.Ct. at 884-85, 130 L.Ed.2d at 861; Wallace v. Dunn Constr. Co., supra, 62 F.3d at 379. However, the pursuit of a discrimination claim against the State by a convicted felon who is disqualified from public employment is so unusual a circumstance that the denial of any relief to such a plaintiff does not create any realistic danger of undermining the effective enforcement of the LAD or CEPA.
Finally, the same policy considerations which require the dismissal of plaintiff's wrongful discharge claims under the LAD and CEPA also require the dismissal of his claims based on an alleged denial of his right to free speech, intentional infliction of emotional distress, conspiracy and invasion of privacy.
Accordingly, the orders denying defendants' motions for summary judgment are reversed.
LESEMANN, J.S.C., temporarily assigned (dissenting).
The underlying premise of the majority's opinion is that N.J.S.A. 2C:51-2(d) expresses a policy which outweighs the policies embodied in the Law Against Discrimination, N.J.S.A. 10:5-1 to 42(LAD) and the Conscientious Employee Protection Act N.J.S.A. 34:19-1 to 8 (CEPA). Because I cannot accept that premise, or the conclusion that the majority sees flowing from that premise, I dissent.
I know of no statement anywhere in the New Jersey Statutes Annotated that equals in power, scope and impact the declaration which the Legislature has set out in section 3 of the Law Against Discrimination, N.J.S.A. 10:5-3:
The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race, creed, color, [or] national origin ..., are a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State; ....
That declaration was contained in a 1977 amendment to LAD which, like virtually every amendment to the Act since its adoption in 1945, has had the effect of "broadening its scope and increasing available remedies." Montells v. Haynes, 133 N.J. 282, 289, 627 A.2d 654 (1993). In 1990, when the Legislature clarified the rights of discrimination victims to obtain legal or equitable relief which predated LAD, it again spoke of "the harm suffered by both the people and the State from the `personal hardships,' caused by discrimination":
The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm.
[Id. at 288, 627 A.2d 654 (quoting L. 1990, c. 12, § 1).]
Our Supreme Court has been no less emphatic in its expressed commitment to those ideals. In Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 30, 429 A.2d 341 (1981), the Court noted that by its pronouncements, "The Legislature has given the Law Against Discrimination a special niche in the legislative scheme...." And in Montells v. Haynes, supra, 133 N.J. at 290, 627 A.2d 654, the Court quoted and emphasized its own earlier language in Fuchilla v. Layman, 109 N.J. 319, 334-35, 537 A.2d 652 (1988), cert. denied, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988):
[T]he clear public policy of this State is to abolish discrimination in the work place. Indeed, the overarching goal of the Law is nothing less than the eradication of `the cancer of discrimination' .... Employment *46 discrimination is not just a matter between employer and employee. The public interest in a discrimination-free work place infuses the inquiry.
Certainly those pronouncements are more than empty rhetoric.[6] They are profoundly important in describing where we, as a state and a nation, have been and in determining where we are going.
Race was an unresolved problem for the founders of our nation. It has continued to haunt us through a civil war, through the turmoil and traumas of the next 100 years, into the crises and climaxes of the 1960's, and to the present day. It is not an overstatement to suggest that our ability to resolve our race related problems may well determine what kind of a nation (and state) we will be over the next century.
The problems of race have not abated. If anything, they have intensified. And complicating our racial tensions, this "nation of immigrants" now deals with a new group of immigrants, not from the European stock that dominated the first 200 years of our history, but in ever increasing numbers from so-called Third World Countries. Civil rights laws such as LAD, Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to -17, and similar acts of the federal government, this State and other states, represent governmental commitments to assure fairness and non-discriminatory treatment for those groups as well as for racial or ethnic minorities. At the same time, increased sensitivity to the needs of other groups have led to their inclusion as "protected classes" so that LAD (and many other civil rights statutes) now prohibit discrimination because of age, marital status, sexual orientation, gender, familial status or handicap. See, N.J.S.A. 10:5-4 and 4.1.
As the cases noted above (as well as countless others) make clear, private enforcement of anti-discrimination laws vindicate important public interests. The award of damages or other relief under statutes such as LAD does more than benefit an individual employee. It also deters further violations and alerts employers to the existence of discriminatory practices within their own sphere of authoritya function which is particularly important when the employer in question is an agency of the state itself.
N.J.S.A. 2C:51-2(d) also embodies a state policy. It provides that one who commits certain criminal offenses is disqualified from holding any "office or position of honor, trust or profit" within the government of the state or any of its subdivisions. That policy seems clear and, of course, it is the obligation of the judiciary to give effect to that legislative determination. However, I can conceive of no basis to elevate that policy determination to a dominant position over the moral and legal principles of the Law Against Discrimination. I see no "special niche" created for N.J.S.A. 2C:51-2(d). If N.J.S.A. 2C:51-2(d) did not exist, I suspect that nothing in this state would change very much. On their own initiative, most state or municipal agencies would probably decline, or at least limit, employment opportunities for convicted felons. And if some such felons were hired, that would hardly change the lives of anyone, except perhaps the employees involved.
If LAD did not exist, however, this state would be profoundly different. That statute provides vital daily protections for substantial numbers of our citizens. Cases applying and interpreting our statute and those of the United States and other states are on the cutting edge of law and society today and they are likely to remain so in the coming years. In recent years, for example, they *47 have dealt with such widely divergent issues as a scout master deprived of his position with the Boy Scouts because of his sexual orientation (Dale v. Boy Scouts of America, 308 N.J.Super. 516, 706 A.2d 270 (App.Div.), certif. granted, 156 N.J. 381, 718 A.2d 1210, (1998)); creation of a hostile work environment because of sexual harassment (Lehmann v. Toys `R' Us., Inc., 132 N.J. 587, 626 A.2d 445 (1993)); claims of discrimination in the provision of low and moderate housing (In re Township of Warren, 132 N.J. 1, 622 A.2d 1257 (1993)); work place discrimination against the handicapped (Andersen v. Exxon Co., 89 N.J. 483, 446 A.2d 486 (1982)); and the rights of girls to play Little League baseball (National Org. for Women v. Little League Baseball Inc., 127 N.J.Super. 522, 318 A.2d 33 (App.Div.), aff'd, 67 N.J. 320, 338 A.2d 198 (1974)). They have effected significant changes over the last thirty plus years, and hopefully, they will do even more in the future.
I do not contend that the policy of LAD should apply to the exclusion of that embodied in N.J.S.A. 2C:51-2(d). Rather, I believe we should be guided by those cases which, in comparable situations, have reconciled those opposing policies so as to take account of both. However, if for some reason we must choose to enforce just one of those conflicting policies I can conceive of no reason why we should enforce the one with less social significance and ignore the one with overriding social importance.[7]
The United States Supreme Court dealt with this issue in McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). There, an employee, McKennon, filed a complaint alleging that she had been discharged because of her age in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621. During pretrial discovery her employer learned that during her employment McKennon had copied several confidential documents, an offense which (the Court assumed for purposes of its opinion) was "so grave that McKennon's immediate discharge would have followed its disclosure." Based on that after acquired evidence, the District Court granted the employer's motion for summary judgment and the Court of Appeals affirmed. 9 F. 3d 539 (1993). The Supreme Court reversed.
In language which could almost have been written for this case, the Court spoke of the policy underlying the ADEA. It described that statute as,
part of an ongoing congressional effort to eradicate discrimination in the work place, [which] reflects a societal condemnation of invidious bias in employment decisions. The ADEA is but part of a wider statutory scheme to protect employees in the work place nationwide.
[513 U.S. at 357, 115 S.Ct. at 884, 130 L.Ed.2d at 860.]
It noted that for violation of the Act a federal court may award "reinstatement, back pay, injunctive relief, declaratory judgment, and attorneys fees." Ibid. And it also noted that the availability of such relief to an individual plaintiff-employee was an important part of the ADEA as well as its cognate statute, Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2(a)(1):
[C]ongress designed the remedial measures in these statutes to serve as a "spur or catalyst" to cause employers "to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges" of discrimination.... Deterrence is one object of these statutes. Compensation for injuries caused by the prohibited discrimination is another.... The private litigant who seeks redress for his or her injuries vindicates both the deterrence and the compensation objectives of the ADEA....

*48 "[T]he private litigant ... not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices."
[513 U.S. at 358, 115 S.Ct. at 885, 130 L.Ed.2d at 861. (Citations omitted.)]
Thus, the Court concluded,
It would not accord with this scheme if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the Act.

[Ibid.]
Disclosure of an incident of discrimination, said the Court, furthers the policy of the Act. Suppression does not:
The objectives of the ADEA are furthered when even a single employee establishes that an employer has discriminated against him or her. The disclosure through litigation of incidents or practices which violate national policies respecting nondiscrimination in the work force is itself important, for the occurrence of violations may disclose patterns of noncompliance resulting from a misappreciation of the Act's operation or entrenched resistance to its commands, either of which can be of industry-wide significance. The efficacy of its enforcement mechanisms becomes one measure of the success of the Act.
[513 U.S. at 358-59, 115 S.Ct. at 885, 130 L.Ed.2d at 861.]
The Court acknowledged, however, that the employee's wrongdoing must also be taken into account. That wrongdoing, discovered after termination, could not constitute a defense to the charge of discrimination, but it should be considered in fashioning an appropriate remedy. As a general rule, said the Court,
In cases of this type, neither reinstatement nor front pay is an appropriate remedy. It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated and will terminate, in any event and upon lawful grounds.
[513 U.S. at 361-62, 115 S.Ct. at 886, 130 L.Ed.2d at 864.]
As a further general rule, the Court held, back pay should be calculated "from the date of the unlawful discharge to the date the new information was discovered." Ibid. While a court can consider "extraordinary equitable circumstances that affect the legitimate interest of either party,"
An absolute rule barring any recovery of back pay ... would undermine the ADEA's objective of forcing employers to consider and examine their motivations, and of penalizing them for employment decisions that spring from age discrimination.
[513 U.S. at 362, 115 S.Ct. at 886, 130 L.Ed.2d at 864.]
Those principles have been applied in several well considered opinions by federal courts of appeal. In Wallace v. Dunn Constr. Co. Inc., 62 F.3d 374 (11th Cir.1995), the court held that while McKennon dealt specifically with the ADEA and concerned a wrongful act committed during employment, it also applied to cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, and to fraudulent information set out on an employment application. In reaching that last conclusion the court dealt with an argument similar to that made by the employer here,
That "one who obtains a job or employment contract by misrepresentation has no employment contract, no employee status and no standing to sue for alleged employment related wrongs."

[Id. at 378.]
The court rejected that argument, emphasizing the "twin objectives" of the statute by which "the private litigant who seeks redress for his or her injuries vindicates both the deterrence and the compensation objectives of the [Acts]." Id. at 379. It applied the general rule laid down in McKennon, under which back pay is normally awarded from "the date of the unlawful discharge to the date the new information was discovered." Id. at 380.
The Third Circuit case of Mardell v. Harleysville Life Ins. Co., 65 F.3d 1072 (3rd Cir.1995) is similar. It too concludes that if a plaintiff in a discrimination case establishes *49 his claim, he should not be barred from all relief because of misrepresentations made in his job application even if he would never have obtained the job but for those misrepresentations:
The protections of Title VII and the ADEA are grounded not in a plaintiff's "right" to a particular job but in a federal proscription of discrimination in employment,...[8]

[65 F.3d at 1074.]
See also, to the same general effect, Hawkins v. 1115 Legal Service Care, 163 F.3d 684 (2d Cir.1998); O'Day v. McDonnell Douglas Helicopter Co., 79 F.3d 756, 759-60 (9th Cir.1996); Russell v. Microdyne Corp, 65 F.3d 1229, 1238 (4th Cir.1995); Coleman v. Keebler Co., 997 F.Supp. 1102, 1121-22 (N.D.Ind.1998).
The majority apparently finds the McKennon line of cases inapplicable because of a distinction between the employees' actions there and the fact that here the employee was statutorily disqualified from the job he actually performed for ten years. As a defense to a discrimination claim, I see no difference between the two. Neither in this case nor any of those cited was the employer aware of the "wrongful" conduct at the time of the employee's discharge. Thus in none of the cases could the improper activity constitute a defense to the employer's discrimination, or even mitigate the significance of that discrimination. In all of the cases there was a strong governmental policy to be vindicated regardless of whether the employee may have misbehaved: if there was discrimination, the discrimination must be rooted outand that remains true whether we like, dislike, approve or disapprove of the plaintiff.
I do not believe the majority has taken sufficient account of the critical point, cited and repeated in cases under LAD, under Title VII, under the ADEA and under every civil rights statute of which I am aware, that individual enforcement proceedings under those statutes are imbued with governmental and policy significance. They exist and are applied in order to further the policy of the statute and the welfare of society. They do not exist solely for the benefit of an individual complainant, whether Charles Cedeno or anyone else:
[T]he private litigant who seeks redress for his or her injuries vindicates both the deterrence and the compensation objectives of [Title VII, the Equal Pay Act and the ADEA]....
[Wallace v. Dunn Construction Co., Inc., supra, 62 F.3d at 379.]
That proposition is particularly significant here, where the employer is the State and the alleged discriminator is an official in a State university. That official hires and fires employees for that university. While the majority apparently finds it unconscionable that one holding a state position had pleaded guilty to a disqualifying crime seventeen years ago, I find it more unconscionable, and more dangerous, to conceive of a present state university official who hires and fires while violating anti-discrimination laws. That, it seems to me, constitutes a social and political evil that dwarfs any concern over plaintiff's having improperly obtained his job ten years ago.
The majority also speaks of equities weighing against plaintiff's right to enforce his discrimination claim. That argument, however, not only overlooks the public interest inherent in vindicating such a claim, but also ignores the fact that this matter is before us on a grant of summary judgment. That being so, neither the trial court nor this court has developed any feel or flavor for the facts of the case. Nevertheless, the majority discusses the case as though we have had a full trial and a full development of the facts. Thus, it refers to "the inequitable consequence of allowing [plaintiff] ... to derive additional profit from the misrepresentations on his employment application." That phrase suggests an employee in a soft job making a comfortable salary. But we do not *50 know that to be a fact. It is entirely conceivable that his employer benefitted more from plaintiff's efforts than he did from the employer's paycheck.
In fact, the only "equity" to which the majority can point is plaintiff's violation of N.J.S.A. 2C:51-2(d) ten years ago, when he did not disclose a conviction seventeen years ago for a crime committed twenty years ago. While McKennon and its progeny do refer to equitable considerations which might justify a variation from the general rule, McKennon also rejects "[a]n absolute rule barring any recovery of back pay." McKennon, supra, 513 U.S. at 362, 115 S.Ct. at 886, 130 L.Ed.2d at 864. Here, the majority's rejection of plaintiff's claim based only on the provisions of N.J.S.A. 2C:51-2(d) amounts to precisely what was denounced in McKennon: the unjustified adoption of an "absolute rule" barring recovery of any back pay by plaintiff.[9] As the Supreme Court noted in Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280, 289-90 (1975), which dealt with a Title VII action,
given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.
Finally, a word should be said concerning the California case cited by the majority, Camp v. Jeffer, Mangels, Butler & Marmaro, 35 Cal.App.4th 620, 41 Cal.Rptr. 2d 329 (1995). There the court was not concerned with an anti-discrimination statute. Rather, in addition to some employment contract issues, it dealt with what it termed "a common law claim of termination in violation of public policy"the public policy apparently being something akin to our CEPA statute. The employees had been ineligible for their employment because of a prior criminal conviction and the fact that the employer's contract with a governmental agency prohibited employment of anyone with such a record. The court referred to the doctrine of unclean hands and the fact that the employees were not "lawfully qualified for their jobs." However, except in a limited sense, it did not discuss the public policy vindication which forms a critical basis for the decisions in McKennon, Wallace, Mardell and similar cases. In the court's limited discussion of the policy issue, it said its decision "adequately served" the state's public policy by barring the employees' claims "and allowing them, if they so desire, to report [the employer's]... alleged wrongdoing to the appropriate authorities." Id., 41 Cal.Rptr.2d at 340. While that suggestion seems at best a half-hearted attempt at policy enforcement, it would not seem applicable here in any event. While in Camp the employer may have been guilty of criminal activity, and thus the employee's reporting the incident might have furthered the policy referred to, that concept does not seem applicable here where the employer is not accused of a crime but simply an unlawful discriminatory discharge. In short, Camp is distinguishable and, to the extent it is not, I find it unpersuasive.
I would affirm.
NOTES
[1] Plaintiff states that he is Hispanic and in his sixties.
[2] Most decisions dealing with the applicability of the after-acquired evidence doctrine involves one of two situations: (1) the employer discovers after the discharge that the employee engaged in improper actions in the course of his or her employment; or (2) the employer discovers after the discharge that the employee misrepresented information on his or her job application. See Wallace v. Dunn Constr. Co., 62 F.3d 374, 379 (11th Cir. 1995). This case involves a third situation: the employer discovered after the discharge that the employee was convicted of a criminal offense which statutorily disqualified him from obtaining public employment.
[3] Plaintiff argues that his disqualification from any New Jersey public employment was not an automatic consequence of his Pennsylvania conviction but rather required the Attorney General or a county prosecutor to bring a forfeiture proceeding in a New Jersey court. Plaintiff relies upon N.J.S.A. 2C:51-2(b)(2), which provides that the Attorney General or a county prosecutor may apply to a court for an order of forfeiture of a public office, position or employment "based upon a conviction of an offense under the laws of another state." However, this case does not involve the forfeiture of public employment which a person held at the time of a criminal conviction but rather the disqualification from future public employment based on a prior criminal conviction. Therefore, this case is not governed by the procedures set forth in N.J.S.A. 2C:51-2(b)(2) but rather by N.J.S.A. 2C:51-2(d), which imposes an automatic disqualification from public employment without the initiation of any court proceeding. See State v. Musto, supra, 187 N.J.Super. at 318, 454 A.2d 449.
[4] Plaintiff alleged in an affidavit submitted in opposition to defendants' motions for summary judgment that notwithstanding the representation on his employment application that he had never been convicted of a crime, he disclosed the Pennsylvania conviction to Dr. Cohen at his employment interview. Dr. Cohen strongly denied this allegation at his deposition. In any event, even if plaintiff could establish that he made a verbal disclosure of his conviction to Dr. Cohen, that would have no effect upon the outcome of this case. Dr. Cohen had no authority to disregard the legislative mandate that persons previously convicted of a crime involving or touching public employment may not be employed in another public position, and plaintiff is deemed to have full knowledge of his disqualification from any public employment in New Jersey. Cf. Walsh v. State, 147 N.J. 595, 689 A.2d 131 (1997), rev'g on dissent 290 N.J.Super. 1, 16, 674 A.2d 988 (App.Div. 1996).
[5] Although the dissent rests entirely on the LAD and federal civil rights decisions, plaintiff's complaint is essentially a whistleblower claim under CEPA. Specifically, plaintiff claims that he was discharged because he raised questions concerning an alleged personal relationship between his supervisor, Mastrangelo, and the owner of one of MSU's suppliers and also objected to certain of MSU's contracting and internal auditing procedures. Consistent with this view of his case, plaintiff's factual discussion in the brief filed with this court relates solely to his CEPA claim. Moreover, we have been unable to locate any evidence in the voluminous discovery materials included in the parties' appendices which could support a finding of discrimination on the basis of ethnicity or age. Under these circumstances, it would seem more appropriate to focus upon CEPA rather than the LAD.
[6] Virtually all the arguments herein concerning LAD apply also to CEPA. However, because the policies underlying LAD and the arguments that flow from that policy seem particularly clear and compelling, I shall refer primarily to LAD without continuing to make simultaneous references to CEPA, and without submitting a separate analysis concerning CEPA. Suffice it to note that the Supreme Court has characterized CEPA as a civil rights statute comparable to LAD and has expressed an equal commitment to its policy:

The whistleblower statute [CEPA], like LAD, is a civil rights statute. Its purpose is to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.... Like LAD, CEPA promotes a strong public policy of the State.
[Abbamont v. Piscataway Township Bd. of Educ. 138 N.J. 405, 431-32, 650 A.2d 958 (1994.) (Citations omitted.)]
[7] The majority insists that "the point is not ... whether the policies expressed in N.J.S.A. 2C:51-2(d) outweigh the policies embodied in LAD and CEPA." Rather, it says it is simply determining and applying the intent of the legislature and harmonizing "the provisions of civil rights laws with other legislative enactments." However, the result of that harmonization, as carried out by the majority, is a total subordination of LAD and CEPA to the provisions of N.J.S.A. 2C:51-2(d) and a conclusion that plaintiff's claims "may not be maintained." I do not understand how one can reach those conclusions except via a premise (as I suggested above) that N.J.S.A. 2C:51-2(d) expresses a policy which outweighs those embodied in LAD and CEPA.
[8] In an earlier opinion at 31 F.3d. 1221 (3d Cir. 1994) which predated McKennon, the Mardell court had reached a conclusion similar to McKennon except that it permitted plaintiff to recover back pay for the period between the date of discharge and the date he filed his complaint. Based on McKennon, the court on remand reduced the allowable back pay to terminate as of "the time that the wrongdoing was discovered." 65 F.3d at 1074.
[9] The majority also engages in what seems to me unwarranted fact finding when it discounts plaintiff's discrimination claim by referring to its "own review" of depositions and transcripts which satisfy it that plaintiff suffered no severe physical or emotional harm to "warrant an award of monetary relief." I do not know to what evidence the majority refers, nor do I see a need at this point (on a motion for summary judgment) for a showing of some severe or aggravated physical or emotional harm. In that respect, compare the statement in Mardell, supra, 65 F.3d at 1074 that a "victim of discrimination suffers a dehumanizing injury as real as, and often of far more severe and lasting harm than, a blow to the jaw."

It should also be noted that the issue on defendants' motion for summary judgment was not whether plaintiff could demonstrate a factual basis for his LAD or CEPA claims under the standard of Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995). Rather, it was whether plaintiff could prosecute those claims at all, and the majority now holds that he may not, no matter how strong or how extensive his claims may be.