750 A.2d 73

CHARLES CEDENO, PLAINTIFF–APPELLANT, v. MONTCLAIR STATE UNIVERSITY, A CORPORATION OF THE STATE OF NEW JERSEY, AND RAYE JEAN MASTRANGELO, DEFENDANTS–RESPONDENTS.

Argued January 3, 2000—Decided April 13, 2000.

474

*John G. Geppert, Jr.,* argued the cause for appellant *(Wiley, Malehorn and Sirota,* attorneys; *Mr. Geppert, Eugene Huang* and *Arla D. Cahill,* on the briefs).

*Steven J. Zweig,* Deputy Attorney General, argued the cause for respondent Montclair State University *(John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Mary C. Jacobson* and *Jerry Fischer,* Assistant Attorneys General, of counsel).

*Howard M. Nirenberg* argued the cause for respondent Raye Jean Mastrangelo *(Nirenberg & Varano,* attorneys; *Sandra N. Varano,* on the brief).

PER CURIAM.

We affirm the judgment of the Appellate Division substantially for the reasons expressed in Judge Skillman's opinion below. *Cedeno v. Montclair State Univ.,* 319 *N.J.Super.* 148, 725 *A.*2d 38 (App.Div.1999). We add the following to address the interplay among *N.J.S.A.* 2C:51–1 to –5 (the Forfeiture Statute), *N.J.S.A.* 10:5–1 to –49 (New Jersey's Law Against Discrimination (LAD)), and *N.J.S.A.* 34:19–1 to –8 (the Conscientious Employee Protection Act (CEPA)).

After being discharged from his position as Director of Purchasing, plaintiff sued his former employer, Montclair State University

(MSU), for discrimination on the basis of age and ethnicity under the LAD, and for retaliatory discharge under CEPA. During discovery, MSU learned that plaintiff failed to disclose a prior conviction for bribery in the course of public employment. Plaintiff's felony conviction disqualified him from public employment pursuant to *N.J.S.A.* 2C:51–2d. Based on that fact, MSU filed a motion for summary judgment, arguing that plaintiff was never entitled to the position and that the discharge was thus lawful.

The Law Division denied the motion, concluding that after-acquired evidence is irrelevant during the liability stage of a discrimination case. The Appellate Division reversed. In so doing, the court found that evidence that plaintiff was forever barred from government employment was of paramount concern. We agree.

▆▆▆ The legislative intent of the Forfeiture Statute is " 'to preclude those who have once violated the public trust from [having] a second opportunity.' " *Pastore v. County of Essex,* 237 *N.J.Super.* 371, 377, 568 *A.*2d 81 (App.Div.1989) (quoting *State v. Musto,* 187 *N.J.Super.* 264, 314, 454 *A.*2d 449 (Law Div.1982), *aff'd,* 188 *N.J.Super.* 106, 456 *A.*2d 114 (App.Div.1983)), *certif. denied,* 122 *N.J.* 129, 584 *A.*2d 205 (1990). As we stated in *Moore v. Youth Correctional Institute,* 119 *N.J.* 256, 271, 574 *A.*2d 983 (1990), "[t]he forfeiture statute ... reflects a belief that the circumstances surrounding a criminal conviction bear directly on an employee's competency and capacity to ... perform any ... job for the state." Moreover, forfeiture is appropriate when an employee's "infraction casts such a shadow" that government employment would be "incompatible with the traits of trustworthiness, honesty, and obedience to law and order...." *Id.* at 270, 574 *A.*2d 983.

▆▆▆ The Legislature has created this "seemingly harsh" sanction of absolute disqualification from government employment to "codif[y] a long-standing policy against retention of offenders in government service." *State v. Lee,* 258 *N.J.Super.* 313, 317, 609 *A.*2d 513 (App.Div.1992). The Forfeiture Statute "was designed to

protect the public, not the offender, and we construe it so as to advance this objective." *Pastore, supra,* 237 *N.J.Super.* at 377–78, 568 *A.*2d 81. Moreover,

[i]t is the public policy of this State that "person[s] holding any public office, position or employment" must avoid committing serious criminal acts or offenses which involve or touch upon their governmental duties, or sacrifice their right to governmental employment. This is a harsh response to a problem serious enough to justify the harshness. The purpose is to prevent miscreants and corrupt officials from again holding office.

[*Id.* at 378–79, 568 *A.*2d 81 (citations omitted).]

That said, we also recognize the important public policies of the LAD and CEPA and the need to construe the statutes liberally to achieve those policies. *Abbamont v. Piscataway Township Bd. of Educ.,* 138 *N.J.* 405, 418, 431, 650 *A.*2d 958 (1994). The purpose of both the LAD and CEPA is deterrence of improper employer conduct to protect society from the vestiges of discrimination. "Both CEPA and LAD ... seek[ ] to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers." *Id.* at 418, 650 *A.*2d 958. The overriding policy of the LAD and CEPA, along with the policy of the Forfeiture Statute, is to protect society at large.

In view of the quality of proofs in this action, we believe that whatever value may be achieved by permitting plaintiff's case to proceed to trial is outweighed by the policy against allowing that same person to obtain public employment after having been convicted of bribery. Contrary to our dissenting colleagues, we do not believe that a different result is required by *McKennon v. Nashville Banner Publishing Co.,* 513 *U.S.* 352, 115 *S.Ct.* 879, 130 *L.Ed.*2d 852 (1995). The plaintiff in that case was not statutorily barred from holding her position. Rather, after the plaintiff's termination, her employer learned that she had violated company policy. This case is different. Here, plaintiff was not permitted by law to occupy the position. Plaintiff is part of a narrow class of individuals who are subject to the rule of forfeiture pursuant to statute.

Nevertheless, we stress that there may be aggravated circumstances "where the need to vindicate the policies of the LAD or CEPA and to compensate an aggrieved party for tangible physical or emotional harm could lead to the conclusion that even a person who was absolutely disqualified from holding public employment should be allowed to seek compensation for harm suffered during that employment." *Cedeno, supra,* 319 *N.J.Super.* at 159–60, 725 *A.*2d 38 (citing *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 626 *A.*2d 445 (1993)(involving aggravated sexual harassment)). Such circumstances may be evident because of either the level of harm sustained by a plaintiff or the nature of a defendant's conduct. In this instance, plaintiff failed to allege sufficiently egregious conduct or severity of harm to overcome the high hurdle of the Forfeiture Statute, which otherwise mandates his discharge.

Accordingly, we agree with the Appellate Division that, on the record presented, "the pursuit of a discrimination claim against the State by a convicted felon who is disqualified from public employment is so unusual a circumstance that the denial of any relief to such a plaintiff does not create a realistic danger of undermining the effective enforcement of the LAD or CEPA." *Cedeno, supra,* 319 *N.J.Super.* at 162, 725 *A.*2d 38. We leave open the possibility that a person absolutely disqualified from public employment may be able to allege facts that would constitute aggravated harm or egregious discriminatory conduct sufficient to survive a motion for summary judgment. Because plaintiff has not done so here, we affirm the judgment below.

O'HERN, J., dissenting,

I would reverse on the basis of the dissenting opinion in the Appellate Division. 319 *N.J.Super.* 148, 163–173, 725 *A.*2d 38 (1999). I appreciate that the Court has circumscribed its ruling to this limited context of a previously convicted person's statutory disqualification from office under *N.J.S.A.* 2C:51–2, but I believe that the Court has set the bar too high in requiring "aggravated [physical or emotional] harm [to plaintiff] or egregious discrimina-

tory conduct" to sustain an award of monetary damages for employment discrimination. *Ante* at 479, 750 *A.2d* at 76.

In *Nicosia v. Wakefern Food Corp.*, 136 *N.J.* 401, 418–19, 643 *A.2d* 554 (1994), the Court expressed its concerns about the application of the after-acquired evidence doctrine in the context of an unlawful discharge based on invidious discrimination or retaliation. The Court observed that the policy concerns that are at stake in applying the after-acquired evidence defense to an unlawful discharge based on invidious discrimination differ from those that are implicated in private employment contract actions based on breach of an implied contract of employment that derives from a personnel manual. We observed that there may be an important distinction between the duties [of an employer] arising from the contract and the duties imposed by remedial legislation. *Id.* at 419–20, 643 *A.2d* 554 (citing *Bazzi v. Western & S. Life Ins. Co.*, 808 *F.Supp.* 1306, 1310 (E.D.Mich.1992)). Subsequently, in a case brought under the Age Discrimination and Employment Act (ADEA), the Supreme Court held that evidence of an employer's misconduct discovered after the employee's discharge in violation of ADEA, could not operate as a complete bar to relief but could limit an award of damages. *McKennon v. Nashville Banner Publ'g Co.*, 513 *U.S.* 352, 115 *S.Ct.* 879, 130 *L.Ed.*2d 852 (1995). The Practising Law Institute has noted:

> The gist of *McKennon* is that employers cannot escape liability for employment discrimination if, at the time of the adverse action, non-discriminatory reasons existed but could not have motivated the employer because they were then unknown. First, the Court emphasized the common purposes of all federal anti-discrimination statutes: to deter unlawful employment practices and to compensate victims for resultant injuries. The deterrent purpose would be undermined if employers knew they could escape liability for admitted discrimination merely by digging into work histories for windfall evidence of misconduct or dishonesty. Second, the Court identified the private, non-government litigant as "a vital element" in all these statutes. The potential litigant would be unduly discouraged if every discrimination claim carried the risk of total defeat based on subsequent disclosure and discovery of embarrassing evidence about the plaintiff unrelated to what motivated the employer.

[William L. Kandel, *Age Discrimination: Recent Decisions by Appellate Courts under the Age Discrimination in Employment Act Through Mid–1999*, 616 *PLI Lit* 7, 70 (1999).]

Ordinarily, application of the *McKennon* balancing test serves "to limit a plaintiff's recovery from the date of the unlawful discharge to the date that the information is uncovered. It is insufficient to show that the misconduct committed by the plaintiff was a terminable offense. The defendant must affirmatively show that plaintiff would have been terminated." Grady B. Murdock, et al., *Developments in Title VII and Section 1981*, 614 *PLI/Lit* 419, 449 (1999). Thus, a claimant in after-acquired evidence cases will ordinarily be entitled to compensation for back pay and emotional distress, but not to front pay and reinstatement (future lost wages). This result was foreshadowed in *Massey v. Trump's Castle Hotel and Casino*, 828 *F.Supp.* 314 (D.N.J.1993).

A 1990 amendment to the LAD, *L.* 1990, *c.* 12, § 1, specifically authorized recovery of emotional distress damages for discrimination claims and the statement accompanying the amendment emphasized that the LAD is to be liberally construed so that all common law remedies are available to persons protected by the LAD.[1] Assembly Judiciary Law and Public Safety Committee Statement to Bills No. 2872, 2118, and 2228 (1990) (reprinted at *N.J.S.A.* 10:5–3). Our cases have disapproved any requirement of expert testimony or independent corroboration as a prerequisite to an emotional distress award in a discrimination case. *Rendine v. Pantzer*, 141 *N.J.* 292, 661 *A.*2d 1202 (1995); *see also Bolden v. SEPTA*, 21 *F.*3d 29, 34 (3d Cir.1994) (expert medical testimony is not required to prove damages for emotional distress in a case

---

[1] Under *N.J.S.A.* 10:5–3, the Legislature permitted common law remedies for the personal hardships from which a victim of discrimination might suffer. The Act recites these "personal hardships": "economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this act."

brought under 42 *U.S.C.* § 1983). Emotional distress is a probable consequence of discrimination and one of the "personal hardships" envisioned by the Legislature as justifying relief. *N.J.S.A.* 10:5-3. It would frustrate the purposes of the LAD if employers were permitted to discriminate against employees. Regardless of the details of an employee's pre- and post-hiring conduct, when "the discriminatory conduct was pervasive during the term of employment ... it would not be sound public policy to bar recovery for injury suffered while employed." *Murillo v. Rite Stuff Foods, Inc.*, 65 *Cal.App.*4th 833, 850, 77 *Cal.Rptr.*2d 12, 23 (1998).

All that is required in a tangible employment action [2] is that the record demonstrate a substantial basis for an award of damages for emotional distress. *Spragg v. Shore Care*, 293 *N.J.Super.* 33, 62, 679 *A.*2d 685 (App.Div.1996). In *Mehlman v. Mobil Oil Corp.*, 153 *N.J.* 163, 178, 707 *A.*2d 1000 (1998), the Court sustained an award of $875,000 in emotional distress damages for a whistleblower. The Court did not require that he have established "aggravated harm." When an award for emotional distress is based on personal humiliation or indignity suffered by the claimant, such an indignity must be the natural, proximate, reasonable and foreseeable result of the discrimination. *Spragg, supra*, 293 *N.J.Super.* at 62, 679 *A.*2d 685 (citing *Gray v. Serruto Builders, Inc.*, 110 *N.J.Super.* 297, 315, 265 *A.*2d 404 (Ch.Div.1970)).

In this case, plaintiff has alleged that his contract was not renewed as a result of his employer's intentional discrimination and retaliation. The harassment that he experienced caused him to collapse at work and suffer a near heart attack. Plaintiff contends that his supervisor was aware of his anxiety attack and attempted to reprimand him both during and after the event.

---

[2] *See Faragher v. City of Boca Raton*, 524 *U.S.* 775, 118 *S.Ct.* 2275, 141 *L.Ed.*2d 662 (1998) (explaining that the requirement of severe and pervasive harassment is necessary to establish a claim of hostile working environment, but is not a requirement for establishing a claim of discrimination involving a tangible employment action, such as discharge, dismissal, or denial of promotion).

Even under the Court's standard, I believe that plaintiff should have his day in court to prove his emotional distress claim. Whatever his failings, Charles Cedeno did not cease to be a person, a human being who seeks redress for the humiliation that flows from a discriminatory act.

I do agree with the Court that this is the exceedingly rare case in which a claimant may be denied back pay from date of discharge rather than the date of discovery of the wrongful conduct. Because the grant of back pay from the date of discharge would conflict with the paramount public policy expressed in *N.J.S.A.* 2C:51–2, the worker was not eligible for the pay and did not work for it. To sum up,

[c]ourts must tread carefully in applying the after-acquired-evidence doctrine to discrimination claims. As noted in *Mardell v. Harleysville Life Ins. Co., supra,* 31 *F.*3d.at pages 1236–1237, "The prospect of a defendant's thorough inquiry into the details of a plaintiff's pre and post-hiring conduct ... may chill the enthusiasm and frequency with which employment discrimination claims are pursued, even in cases where the victim of discrimination has nothing to hide, let alone cases where the potential plaintiff is not entirely blameless. Placed in context of the general pervasiveness of resume fraud and employee misconduct, the likely consequence of the widespread exploitation of after-acquired evidence will be underenforcement of [antidiscrimination statutes], and consequently underdeterrence of discriminatory employment practices."

[65 *Cal.App.*4th at 844, 849, 77 *Cal.Rptr.*2d 12, 21 (footnotes omitted).]

That result would be strongly inconsistent with public policy of New Jersey.

Like LAD, CEPA promotes a strong public policy of the State. "We view this legislation as a reaffirmation of this State's repugnance to an employer's retaliation against an employee who has done nothing more than assert statutory rights and protections and a recognition by the Legislature of a preexisting common-law tort cause of action for such retaliatory discharge." "In New Jersey we are deeply committed to the principle that an employer's right to discharge an employee carries a correlative duty to protect his freedom to decline to perform an act that would constitute a violation of a clear mandate of public policy."

[*Abbamont v. Piscataway Twp. Bd. of Educ.,* 138 *N.J.* 405, 431–32, 650 *A.*2d 958 (1994) (internal citations omitted).]

We recently reviewed a case in which an employer was alleged to have denied an employee a promotion because of the employee's race. *Spencer v. Bristol–Meyers Squibb Co.* 156 *N.J.* 455, 720 *A.*2d 601 (1998). In that case, the father of a co-employee (who

was a customer of the firm) was said to have objected to his daughter working with a person of the plaintiff's color. An employer who engages in such open discrimination should not, through the receipt of after-acquired evidence, receive a free pass to discriminate so long as the employer does not cause the employee to be hospitalized or placed under medical treatment.

Justice LONG joins in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices GARIBALDI, STEIN, COLEMAN and VERNIERO—5.

*For reversal*—Justices O'HERN and LONG—2.