947 A.2d 626

JOHN CICCHETTI, PLAINTIFF–RESPONDENT, v. MORRIS COUNTY SHERIFF'S OFFICE, SHERIFF EDWARD ROCHFORD AND UNDERSHERIFF JOHN DEMPSEY, DEFENDANTS–APPELLANTS, AND GERALD MARINELLI AND JOHN MCWILLIAMS, DEFENDANTS–RESPONDENTS, AND JOHN DOES 1–10, DEFENDANTS.

Argued September 24, 2007—Decided May 28, 2008.

564

*John M. Barbarula,* argued the cause for respondent Gerald Marinelli.

*John M. Bowens,* argued the cause for respondent John McWilliams (*Schenck, Price, Smith & King,* attorneys).

*Vincent Paragano,* argued the cause for respondent John Cicchetti (*Paragano & Richlan,* attorneys).

Justice HOENS delivered the opinion of the Court.

Plaintiff John Cicchetti's appeal raises questions relating to workplace discrimination claims that are both novel and complex. The first calls upon this Court to consider the effect, if any, that a law enforcement job applicant's failure to disclose an expunged conviction has on his subsequent complaint based on claims of workplace discrimination and hostile work environment. Although we have held that one who was statutorily barred from public employment, but who was hired by concealing that disqualification,

is generally precluded from pursuing a claim for wrongful termination, *see Cedeno v. Montclair State Univ.,* 163 *N.J.* 473, 479, 750 *A.*2d 73 (2000), we have not previously considered whether an employee who conceals requested but not disqualifying information when applying for a job is also precluded from pursuing an employment discrimination claim. Nor have we addressed the question of whether such information has any relevance to an individual's claim that he or she was subjected to a hostile work environment during the time when he or she was actually employed.

These issues require us to consider the balance between the legitimate needs of law enforcement employers to receive and consider any applicant's prior criminal history and the oft-repeated, strongly expressed policy of our Legislature to rid our workplaces, public and private, from any and all forms of discrimination.

Our consideration of that carefully struck balance compels us to conclude that because plaintiff was not statutorily barred from the employment he sought in law enforcement, he was not prohibited from pursuing his workplace discrimination complaint. In the context of limiting the scope of its liability when faced with such a complaint, an employer may demonstrate that the employee would have been terminated as soon as the withheld information was discovered. This evidence, however, is only relevant to the quantum of damages. More particularly, we hold that such evidence may be used to limit or potentially even eliminate economic damages, including backpay and front pay. Notwithstanding that conclusion, we further hold that, consistent with our Legislature's strong pronouncements about workplace discrimination, this evidence may not be used to diminish an award of non-economic damages to an employee arising from a hostile work environment.

The second issue presented in this appeal requires this Court to consider the role of a supervisor for purposes of fixing liability for workplace discrimination. In part this inquiry relates to the supervisor's role for purposes of imputing liability to an employer,

but it also demands that we consider the grounds on which a supervisor may be held personally liable for acts of discrimination that take place in the workplace. Because the statutory basis for personal liability by any individual is limited to acts that constitute aiding or abetting, and because this record reveals no act by either of the individual supervisory defendants sufficient to meet that statutory test, we conclude that neither of the individual defendants bears personal liability to this plaintiff.

## I.

In 1974, plaintiff was arrested and charged with two offenses, breaking and entering, *N.J.S.A.* 2A:94-1, and stealing, *N.J.S.A.* 2A:119-2. He thereafter entered into a guilty plea, as a result of which he was convicted. At the time, he was twenty-one years old and was not engaged in public employment. In February 1990, plaintiff obtained a court order expunging the 1974 arrest and conviction from his record. The order provided, in part, that "the arrest which is the subject of this Order shall be deemed in contemplation of law not to have occurred and [plaintiff] may answer accordingly any questions relating to this occurrence." The order further stated that information pertaining to the expunged records "shall not be released except as provided under the provision of *N.J.S.A.* 2C:52-1 *et seq.*"

At the time, plaintiff asked his attorney to explain the meaning of the expungement order. According to plaintiff, the attorney assured him that the order meant that the 1974 arrest and conviction "never happened" and that he was not required to disclose it if asked. Plaintiff did not separately inquire about the meaning of the language in the order referring to a statutory exception governing the release of the expunged records.

Twenty years after his arrest, and four years after the order of expungement was granted, plaintiff applied to become a Morris County Sheriff's Officer. The application form asked whether the applicant had "ever been arrested, indicted, or convicted for any violation of the criminal law?" Relying on the order of expunge-

ment and the advice of his attorney about the meaning of that order, plaintiff believed he was not required to reveal the 1974 arrest and conviction. He therefore answered "No" to this question.

Plaintiff was hired and began working as a Sheriff's Officer. He received a permanent appointment in December 1994, after completing his training. Late in 1996, plaintiff participated in a blood drive sponsored by the Sheriff's Office. As a result of routine testing performed on the blood of all donors at that event, he learned for the first time that he had Hepatitis C.[1] In spite of that diagnosis, he continued to work and was able to perform all of his usual duties as a Sheriff's Officer. When word of his diagnosis spread throughout the department, however, he became the target of a variety of acts of harassment that he believed he was being forced to endure because of his disease.

According to plaintiff's complaint, he was both ostracized and harassed through a variety of means. He asserts in particular that two of his fellow officers, defendants Gerald Marinelli and John McWilliams, instigated the harassment and encouraged others to join them. Plaintiff points to numerous examples of what he endured both directly at their hands and by others at their behest. Some were repeated acts of verbal abuse and taunting. For example, they, and others, began to call plaintiff "Hepatitis Boy"; persisted in referring to him as, or warning other officers

---

[1] According to the United States Center for Disease Control (CDC), "Hepatitis C is a liver disease caused by the hepatitis C virus (HCV), which is found in the blood of persons who have this disease. HCV is spread by contact with the blood of an infected person." *Frequently Asked Questions About Hepatitis C*, available at www.cdc.gov/Ncidod/diseases/hepatitis/c/faq.htm. There are a number of ways to contract the disease, but they involve direct contact with the blood of an infected person. *Ibid.* Because "[r]ecent studies suggest that HCV may survive on environmental surfaces at room temperature at least [sixteen] hours," *ibid.*, the CDC recommends that blood spills should be cleaned up with a diluted bleach solution by a person wearing gloves. Even among individuals sharing a household, however, HCV is not spread "very often[, and when it] is spread within a household, it is most likely due to direct exposure to the blood of an infected household member." *Ibid.*

that he was, a health risk; and repeatedly mentioned death and dying to him or in his presence. Others were acts that drew attention to his disease through exaggerated displays of cleaning or sanitizing objects he had touched or areas where he had been. For example, there were constant uses in his presence of all sorts of household disinfectants, sprays and cleansers which were left where he would find them or applied to equipment he had used, often as he watched. Other officers refused to shake his hand, handed him jail keys that had just been soaked in alcohol, chained chairs to prevent him from sitting in them, and donned latex gloves and wore surgical masks when he was around.

Other acts included piling coat hangers, wires, shoes, dirty boots, and old clothes on or in front of his locker and throwing, dumping or smashing bottles of mouthwash against his locker. Some of the incidents were designed to prevent him from communicating by radio when he was transporting prisoners. His radio was taken or disassembled and hidden from him. By using a technique known as "keying over" plaintiff's radio transmissions, the other officers were able to block him from broadcasts and disrupt his communications with fellow officers. Moreover, they refused to allow him to relieve other officers who were on duty, would not sit with or be seated at a lunch table with him, and openly avoided even incidental contact with him.

Although plaintiff had discussed some of these activities with one of his supervisors as early as May 1999, he came to believe, following an incident on April 12, 2000, that the behaviors directed toward him were "escalating into physical threats." On April 17, 2000, plaintiff complained to a supervising officer about this pattern of conduct and was advised to file a formal report. Three days later he did so, filing his report with defendant John Dempsey, who was both the Undersheriff and the Equal Employment Opportunity Coordinator for the Sheriff's Office.

Plaintiff's report was based on notes that he had been making since November 16, 1998, which was the date when plaintiff returned to duty after having undergone what he described as

experimental treatment for his disease. The report is lengthy, recounting the details of seventy-five different events that plaintiff considered to be representative of the pattern of harassment visited upon him by his fellow officers.

At the end of his report, plaintiff described the incident that caused him to reach out to his supervisors for their assistance. In an act that plaintiff considered to be overt intimidation that placed him in physical danger, he encountered a man he believed was defendant McWilliams. He only saw the side of the man's face and his aviator-type sunglasses, but he recounted that the man, already seated in a vehicle, waited for plaintiff in the parking deck, saw him approaching on a narrow ramp, and drove directly at him, gunning the engine and only avoiding contact with him at the last moment. Plaintiff closed his report with a plea to his supervisors for their help in bringing these acts of harassment to an end.

After plaintiff filed his report, he attended a meeting with Dempsey and Chief Thomas Baxter about the acts he had complained of in the report. According to plaintiff, he spoke to Dempsey again on May 15, because the actions and behaviors he had complained about had continued undeterred and it appeared that his complaint had not been resolved. At that time, Dempsey told plaintiff that he had discussed the issues with Marinelli and McWilliams, who had both assured him that they were "unaware" of plaintiff's "situation" and that they would "try to be more understanding" in the future. Following this meeting with Dempsey, when plaintiff returned to his locker, he found that someone had piled old coathangers and boots in front of it and had smashed a bottle of mouthwash against it as well. The next day, plaintiff again complained to Dempsey. According to plaintiff, nothing was done to address his complaints. In fact, in spite of his report and his requests for assistance, McWilliams and Marinelli continued to harass him, repeatedly interfering with his radio transmissions, referring to him as a health risk, and encouraging all of the other officers to shun him.

Following a lunch break on November 14, 2000, during which plaintiff was affirmatively shunned, avoided and ostracized by the other officers, none of whom would sit near him in the crowded break room, plaintiff signed out early. In his words, he did so because he "began to feel anxious, nauseated, frustrated and deeply hurt that [he] was still being treated like a leper." He never returned to work after that date and submitted his formal resignation letter on February 25, 2002.

## II.

After plaintiff resigned, he filed his complaint in the Law Division. He named as defendants the Sheriff's Office, as well as Sheriff Rochford, Undersheriff Dempsey and Sheriff's Officers Marinelli and McWilliams. His complaint asserted that he was protected by the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, because of his medical condition and that defendants were liable to him for discrimination based on his disability and for the hostile work environment. In particular, he asserted that defendants Rochford and Dempsey were liable for failing to act on his complaints and for permitting the harassment to continue, and that defendants Marinelli and McWilliams [2] were liable to him individually as aiders and abettors. *See N.J.S.A.* 10:5–12(e).

Defendants McWilliams and Marinelli moved for summary judgment, arguing that they could not be individually liable to plaintiff because they were neither supervisors nor aiders and abettors of any acts that might be considered to be violations of the LAD. The other defendants supported that motion, although none moved formally for relief. They added an argument that plaintiff's 1974 arrest and conviction barred him from employment in the Sheriff's Office and that his failure to disclose that arrest and conviction precluded him from bringing any suit against defendants.

---

[2] The complaint also included a count charging Marinelli and McWilliams with defamation. The order dismissing that cause of action was not appealed.

The Law Division granted the motion for summary judgment and extended its scope to all of the defendants. The court concluded that notwithstanding the order of expungement, plaintiff was obligated to reveal his prior conviction when he applied for a position with the Sheriff's Office; that the conviction disqualified him from that employment; and that he was therefore precluded from filing any employment-related suit against the Sheriff's Office. Recognizing, however, that this Court had previously held that there might be circumstances in which the LAD would afford relief to an aggrieved individual notwithstanding such a disqualification, *see Cedeno, supra,* 163 *N.J.* at 479, 750 *A.*2d 73, the court considered plaintiff's allegations substantively. In doing so, the court concluded that plaintiff's allegations were "not so egregious that denying his claim would undermine the effective enforcement of the LAD."

Although the court found that plaintiff was precluded from proceeding, the court separately considered, in the alternative, whether he had any substantive right to proceed on a complaint against Marinelli and McWilliams. The court noted that, because they were plaintiff's co-employees, they could only be liable to plaintiff if they were aiders and abettors within the meaning of *N.J.S.A.* 10:5–12(e). Reasoning that McWilliams and Marinelli could not aid or abet their own acts, the court concluded that there was no statutory basis for plaintiff's complaint against them.

Finally, the court considered separately whether plaintiff's allegations, if true, were sufficient to establish a hostile work environment claim. Describing plaintiff's factual assertions as merely evidence of "boorishness" on the part of defendants, the court reasoned that the complained-of behaviors and actions fell short of actionable conduct. Because the court had concluded that Marinelli and McWilliams were entitled to summary judgment on grounds that would apply equally to plaintiff's claims against all of the defendants, plaintiff consented to the entry of an order extending that relief to the remaining defendants.

In an unpublished decision, the Appellate Division affirmed in part and reversed in part. Agreeing with the Law Division that

McWilliams and Marinelli, as co-employees, could not be personally liable to plaintiff for any of their behavior, the Appellate Division affirmed [3] the Law Division's order granting summary judgment as to them. However, the panel reversed the Law Division's order as it related to the Sheriff's Office, Sheriff Rochford and Undersheriff Dempsey. In particular, the panel reasoned that there was sufficient evidence to support the hostile work environment and discrimination [4] claims against the Office of the Sheriff. In addition, it concluded that based on the record describing the inadequacy of the remedial actions taken by Dempsey and Rochford, there was sufficient evidence to permit a jury to consider their liability to plaintiff as his supervisors.

In doing so, the panel rejected defendants' arguments that because of plaintiff's prior conviction he was either statutorily barred from holding public employment or that he was precluded from maintaining suit because of his failure to disclose that fact in his employment application. Based on this analysis and these conclusions, the Appellate Division reversed the Law Division's order of summary judgment in favor of the Sheriff's Office, Sheriff Rochford and Undersheriff Dempsey and remanded those claims for trial. We granted the petition for certification filed by these defendants. 189 *N.J.* 649, 917 *A.*2d 789 (2007).

### III.

We begin our analysis of the issues by considering defendants' assertion that plaintiff's failure to disclose his expunged 1974

---

[3] Plaintiff did not challenge the Appellate Division's judgment affirming the grant of summary judgment in favor of defendants Marinelli and McWilliams through a cross-petition for certification. *See R.* 2:12–11. We therefore will not consider the meaning and scope of aiding and abetting. *See State v. Oliver,* 133 *N.J.* 141, 160, 627 *A.*2d 144 (1993).

[4] During the pendency of the appeal, the appellate panel invited the parties to submit briefs directed to the question of whether plaintiff's disease, HCV, qualified as a "disability" for purposes of the statute, *see N.J.S.A.* 10:5–5(q). No party has challenged that aspect of the Appellate Division's analysis before this Court, as a result of which we need not consider it.

conviction in his employment application prevents him from proceeding on any employment-based theory. In summary, defendants rely on two separate lines of reasoning, either of which, they contend, would suffice for this purpose. First, they assert that this Court's decision in *Cedeno, supra*, stands for the proposition that any prior conviction not only bars public employment but also precludes one so barred, but who is nonetheless hired and then terminated, from suing for any form of relief based on an assertion that his termination violated LAD or the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8. Second, they contend that plaintiff's expungement order did not prevent the Sheriff's Office from requiring that he divulge the fact of that prior arrest and conviction because the expungement statute specifically so provides. *See N.J.S.A.* 2C:52–27(c). Defendants argue that by failing to disclose it, plaintiff misrepresented the truth in his employment application and should not be permitted to proceed on any employment-based claim as a result.

Although we do not condone plaintiff's wrongful failure to disclose his prior expunged arrest and conviction, that failure does not grant defendants carte blanche to act without regard to their own legal obligations. Therefore, we do not agree with either aspect of defendants' analysis. Our consideration of these issues requires us to explore more generally the relationship between evidence of wrongdoing either on the job or during the application process, and employment-based claims for relief.

## A.

Prior to 1995, federal courts had developed two different positions concerning the effect of after-acquired evidence in employment litigation. *See, e.g.,* Robert Belton, *The Unfinished Agenda of the Civil Rights Act of 1991*, 45 *Rutgers L.Rev.* 921, 944–45 (1993) (examining history of after-acquired evidence doctrine in federal courts). One of those lines of authority, adopted by the United States Court of Appeals for the Tenth Circuit, held that after-acquired evidence can be used to bar recovery in an employ-

ment discrimination suit in its entirety. *See Summers v. State Farm Mut. Auto. Ins. Co.*, 864 *F*.2d 700, 708 (10th Cir.1988). Even if the evidence of a fired employee's on the job wrongdoing was not discovered until after he was terminated, the Tenth Circuit concluded that it could operate as a complete defense. That is, if the after-acquired evidence would have led to the employee's discharge, then he could not recover, even if he could demonstrate that he had in reality been wrongfully terminated based, in that case, on his age or religion. The court regarded it as "utterly unrealistic" to ignore the after-acquired evidence, because doing so would entitle "a company doctor ... fired because of his age, race, religion, and sex ... [but who, it is later discovered,] was not a 'doctor' " to a recovery. *Ibid.* In the Tenth Circuit's view, if the employee's wrongdoing was sufficiently egregious that the employee would have been terminated for a legitimate reason, he could not argue that he was injured because he was instead terminated for an illegitimate, discriminatory, one. *Ibid.*

The other line of authority in the federal courts, prior to 1995, was exemplified by a decision of the United States Court of Appeals for the Third Circuit. *See Mardell v. Harleysville Life Ins. Co. ("Mardell I")*, 31 *F*.3d 1221, 1238 (3d Cir.1994) (holding that after-acquired evidence does not provide complete defense to discrimination cause of action). That court held that after-acquired evidence could not be used "substantively for the purpose of defending against liability" but that it could play a role in evaluating the available remedies to which a plaintiff would be entitled. *Ibid.* As the court explained,

[a]fter-acquired evidence, simply put, is not relevant in establishing liability under Title VII or ADEA [Age Discrimination in Employment Act, 29 *U.S.C.A.* § 623a(1)] because the sole question to be answered at that stage is whether the employer discriminated against the employee on the basis of an impermissible factor at the instant of the adverse employment action.

[*Id.* at 1228.]

Although after-acquired evidence therefore could play no role in deciding whether a particular employer was liable to a plaintiff for

discriminatory discharge, the Third Circuit reasoned that it might preclude certain equitable remedies, such as reinstatement, because that remedy is "particularly invasive of the employer's 'traditional management prerogatives'...." *Id.* at 1240.

In 1995, the United States Supreme Court resolved this split among the Circuits, announcing its rule relating to after-acquired evidence in the context of a plaintiff's claim that he was wrongfully discharged based on his age. *See McKennon v. Nashville Banner Publ'g Co.*, 513 *U.S.* 352, 115 *S.Ct.* 879, 130 *L.Ed.*2d 852 (1995). The Court forged a path similar to the one created by the Third Circuit, concluding that after-acquired evidence of wrongdoing, which otherwise would have resulted in the employee's discharge, does not bar that employee from all relief under the ADEA. *Id.* at 356, 115 *S.Ct.* at 883, 130 *L.Ed.*2d at 860. The Court continued its analysis, however, and held that such evidence could be used by an employer to limit a prevailing plaintiff's remedies.

In so holding, the Court limited the evidence that could be used in this manner by requiring that the employer "first establish that the wrongdoing was of such severity that the employee would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362–63, 115 *S.Ct.* at 886–87, 130 *L.Ed.*2d at 864. The Court made it clear that if the employer is able to meet that threshold, the employee will not be entitled to an award of front pay or to the equitable relief of reinstatement. *See id.* at 361–62, 115 *S.Ct.* at 886, 130 *L.Ed.*2d at 863. At the same time, absent "extraordinary equitable circumstances that affect the legitimate interests of either party," the plaintiff would be entitled to an award of backpay. *Id.* at 362, 115 *S.Ct.* at 886, 130 *L.Ed.*2d at 864. The available backpay award, however, was limited, as the Court held that it was to be calculated from the date of the unlawful discharge only until the date when the wrongdoing, that would have legitimately led to the employee's termination, was discovered. *See id.* at 362, 115 *S.Ct.* at 886, 130 *L.Ed.*2d at 864.

In explaining its holding, the Court specifically recognized the significant competing public policy considerations that needed to be weighed and balanced. First, although it was being called upon to apply the after-acquired evidence doctrine to claims brought under the ADEA, the Court noted that the "substantive, antidiscrimination provisions of the ADEA are modeled upon the prohibitions of Title VII." *Id.* at 357, 115 *S.Ct.* at 884, 130 *L.Ed.*2d at 860 (citing *Trans World Airlines, Inc. v. Thurston*, 469 *U.S.* 111, 121, 105 *S.Ct.* 613, 621, 83 *L.Ed.*2d 523, 533 (1985)). The Court found that the ADEA and Title VII "share common substantive features and also a common purpose: 'the elimination of discrimination in the workplace.'" *Id.* at 358, 115 *S.Ct.* at 884, 130 *L.Ed.*2d at 861 (quoting *Oscar Mayer & Co. v. Evans*, 441 *U.S.* 750, 756, 99 *S.Ct.* 2066, 2071, 60 *L.Ed.*2d 609, 616 (1979)).

Moreover, the Court reasoned that this common purpose may be accomplished in two ways. "Deterrence is one object of these statutes. Compensation for injuries caused by the prohibited discrimination is another." *Ibid.* (citing *Albemarle Paper Co. v. Moody*, 422 *U.S.* 405, 418, 95 *S.Ct.* 2362, 2372, 45 *L.Ed.*2d 280, 297 (1975); *Franks v. Bowman Transp. Co.*, 424 *U.S.* 747, 763–64, 96 *S.Ct.* 1251, 1264, 47 *L.Ed.*2d 444, 461 (1976)). The Court concluded that these purposes, each of which is embodied in Title VII and the ADEA, would be frustrated if the Court adopted an approach that would permit after-acquired evidence to act as a complete bar to recovery. *See id.* at 358–59, 115 *S.Ct.* at 884–85, 130 *L.Ed.*2d at 861–62.

On the other hand, the Court recognized that employers had significant interests to be considered as well. The Court concluded:

> The employee's wrongdoing must be taken into account ... lest the employer's legitimate concerns be ignored. The ADEA, like Title VII, is not a general regulation of the workplace but a law which prohibits discrimination. The statute does not constrain employers from exercising significant other prerogatives and discretions in the course of the hiring, promoting, and discharging of their employees.
>
> [*Id.* at 361, 115 *S.Ct.* at 886, 130 *L.Ed.*2d at 863.]

The *McKennon* Court carefully analyzed these policy concerns and struck a balance between the protective purposes of the two federal anti-discrimination statutes and the legitimate rights of employers to terminate workers for entirely reasonable business purposes.

Following its decision in *McKennon*, the Supreme Court remanded the decision in *Mardell I* to the Third Circuit for its reconsideration in light of the newly-announced rule. *Harleysville Life Ins. Co. v. Mardell*, 514 *U.S.* 1034, 115 *S.Ct.* 1397, 131 *L.Ed.*2d 286 (1995). Concluding that its earlier decision was "almost entirely consistent with *McKennon*," the Third Circuit affirmed its earlier holding in large part. *Mardell v. Harleysville Life Ins. Co.* ("*Mardell II*"), 65 *F.*3d 1072, 1073 (3d Cir.1995). The court noted, however, that the *McKennon* Court had adopted a different backpay analysis than the Third Circuit had originally utilized. *Ibid.* As the Third Circuit noted, unlike the *Mardell I* theory that backpay should be awarded until the date of judgment so as "to ensure that the plaintiff was returned to the position she would have been in but for the discrimination," the *McKennon* rule required that "absent extraordinary circumstances, backpay runs only until the date that the employer discovered the conduct for which it would have fired the employee." *Ibid.*

Significantly, the Third Circuit pointed out that it would "make no effort at this juncture to adumbrate the contours of [*McKennon's*] 'extraordinary equitable circumstances' doctrine." *Id.* at 1074 n. 4 (quoting *McKennon, supra*, 513 *U.S.* at 362, 115 *S.Ct.* at 886, 130 *L.Ed.*2d at 863). The court also declined to address whether the remedies available would be different depending on whether the employee committed on-the-job misconduct that the employer later discovered, or had instead engaged in other types of misconduct, such as resume fraud. *Ibid.* Instead, the court:

simply note[d] that the Supreme Court did not limit the general principles articulated in *McKennon* to cases involving on-the-job misconduct, instead using the broader term "wrongdoing" as well as listing both types of after-acquired evidence cases (resume fraud cases and cases of on-the-job misconduct)—without distinguishing between them—when it noted the split among the circuits.

[*Ibid.*]

Finally, the Third Circuit in *Mardell II* rejected the employer's contention that no remand to the district court was needed because, in the employer's view, plaintiff was not entitled to any damages under the *McKennon* rule. *Id.* at 1074. The employer pointed out that the evidence it had discovered during the litigation amounted to resume fraud, because plaintiff had claimed to have a college degree that she had not yet been awarded and had inflated the descriptions of her previous employment. *See Mardell I, supra,* 31 *F.*3d at 1223–24. The employer argued that because resume fraud is a form of misrepresentation, it should be analyzed as voiding the employment contract under the doctrine of fraud in the inducement. *See Mardell II, supra,* 65 *F.*3d at 1074. The employer reasoned that under this theory, plaintiff was entitled to no award of damages. *See ibid.* In rejecting this theory, the Third Circuit reasoned that "the protections of Title VII and the ADEA are grounded not in a plaintiff's 'right' to a particular job but in a federal proscription of *discrimination* in employment." *Ibid.*

Following the announcement of the *McKennon* rule, the other federal circuits have reached conclusions that are similar to those of the Third Circuit. For example, the United States Court of Appeals for the Eleventh Circuit has held that the *McKennon* rule applies not only to Title VII claims but also to complaints for relief pursuant to the Equal Pay Act, 29 *U.S.C.A.* § 206(d)(1). *See Wallace v. Dunn Constr. Co.,* 62 *F.*3d 374, 377 (11th Cir.1995). In an *en banc* decision by the court, partially reversing a panel's reasoning in light of *McKennon,* the Eleventh Circuit concluded that the *McKennon* rule applies to such claims regardless of whether the after-acquired evidence relates to on-the-job misconduct or to misrepresentations made in a job application or resume. *Id.* at 379. That court, like the Third Circuit, has explicitly rejected an employer's argument that an employee who obtains a job by misrepresentation has no legitimate employee status and no valid employment contract and therefore has no standing to bring a wrongful discharge claim. *See id.* at 379. In reaching this

conclusion, the Eleventh Circuit found support in the same public policy interests that the *McKennon* Court identified, namely, deterring discrimination and compensating victims. *Ibid.*

The United States Court of Appeals for the Fifth Circuit has followed a similar analysis, concluding that the issue, for wrongful discharge purposes, is whether the information, when discovered, would have independently supported discharge from the position. *See Shattuck v. Kinetic Concepts, Inc.*, 49 *F.*3d 1106 (5th Cir.1995). Although the terminated employee in *Shattuck* conceded that he had falsified his resume by claiming that he had a college degree when he did not, and did so because he believed that he would not be hired without one, the court concluded that the appropriate focus is not on whether the employee would have been hired, but whether, when the concealed information was discovered, he or she would have been fired. *Id.* at 1108. The Fifth Circuit commented that this approach preserves the appropriate balance among the competing public policy considerations, noting:

> The rationale underlying consideration of after-acquired evidence is that the employer should not be impeded in the exercise of legitimate prerogatives and the employee should not be placed in a better position than he would have occupied absent the discrimination. Cutting off relief at the time that a legitimate discharge would have occurred accomplishes these ends. Merely asking whether the employee would have been hired fails to recognize that an employer may retain an individual who has performed successfully, despite lack of formal qualification.
>
> [*Id.* at 1108–09.]

Although the *McKennon* rule has become firmly established, the Supreme Court left unanswered two questions that are relevant to our analysis in this matter. First, the Court did not evaluate under what circumstances an employer could defeat a backpay award by demonstrating that an employee's job application misrepresentation or pre-employment conduct was so serious that he or she would not have been hired at all had it been revealed. Second, the Court was not called upon to consider whether its analysis about the available remedies might be altered if the basis for the employee's complaint was not simply wrongful termination, but also included a claim equivalent to hostile work

environment under our LAD.[5]  Each of these questions, however, bears on our analysis of the issues now before us.

## B.

It is, of course, true that in *Cedeno, supra,* we concluded that one who is statutorily disqualified from obtaining public employment because of a prior conviction ordinarily may not maintain a cause of action for wrongful termination pursuant to the LAD or CEPA.  163 *N.J.* at 478, 750 *A.2d* 73.  We did not, however, decide *Cedeno* in a vacuum, and it can only be understood in the larger context of the debate about the uses of after-acquired evidence.  As we have seen in our discussion of the development of these concepts in the federal courts, the issue most often arises as part of an employer's defense to a claim by a plaintiff for wrongful termination.  It revolves around the employer's use of after-acquired evidence of misconduct, either during the hiring process or while on the job, as an alternate ground for demonstrating that an otherwise wrongful termination is not actionable.

Even before the Supreme Court announced its decision in *McKennon,* we recognized the significant public policy dilemma posed by this doctrine in the context of a termination alleged to have been discriminatory.  *See Nicosia v. Wakefern Food Corp.,* 136 *N.J.* 401, 417–21, 643 *A.2d* 554 (1994).  We did not directly address its application or its parameters, however, because we rejected its relevance to a claim that a termination violated an implied contract of employment.  *Ibid.*

---

[5] One federal district court decision considered the implications of the remedies permitted by our LAD, as compared to the relevant federal statutes, for purposes of attempting to apply the after-acquired evidence doctrine to a complaint that raised both federal and state law claims.  *See Miller v. Beneficial Mgmt. Corp.,* 855 *F.Supp.* 691, 715–18 (D.N.J.1994).  In particular, that decision recognized the distinctions that could be drawn between the policies to be advanced by our anti-discrimination laws and those furthered by the federal statutes.  *Ibid.*  However, because the decision preceded both *Mardell I* and *McKennon,* its significance is limited.

Nor were we required to address the implications of the doctrine in *Cedeno*, because that plaintiff was disqualified by statute from any public employment whatsoever. He had been convicted of bribery, a crime that he had committed in the course of a previous position as a public employee in another state. Because of the nature of the conviction, Cedeno was "forever disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions." *N.J.S.A.* 2C:51-2(d). We reasoned that there were strong public policy reasons in favor of imposing a bar on a claim for wrongful termination filed pursuant to the LAD when the claimant was disqualified from the job in the first place. In particular, we relied on the purpose of the employment forfeiture statute itself, reasoning that it is designed "to preclude those who have once violated the public trust from [having] a second opportunity," *Cedeno, supra*, 163 *N.J.* at 477, 750 *A.2d* 73 (citations omitted), and that it operates to "prevent miscreants and corrupt officials from again holding office." *Id.* at 478, 750 *A.2d* 73 (citation omitted).

Even so, we left open the possibility that "there may be aggravating circumstances 'where the need to vindicate the policies of the LAD or CEPA ... could lead to the conclusion that even a person who was absolutely disqualified from holding public employment should be allowed to seek compensation for harm suffered during that employment.'" *Id.* at 479, 750 *A.2d* 73 (quoting *Cedeno v. Montclair State Univ.*, 319 *N.J.Super.* 148, 159-60, 725 *A.2d* 38 (App.Div.1999)). In the case of a plaintiff who, like Cedeno, would otherwise be statutorily barred from employment but who claimed to have been the victim of discrimination or retaliatory discharge, we struck a new balance. We concluded that, in those narrow circumstances, the otherwise-barred plaintiff could proceed on a complaint within the LAD or CEPA only if he or she were "able to allege facts that would constitute aggravated harm or egregious discriminatory conduct sufficient to survive a motion for summary judgment." *Cedeno, supra*, 163 *N.J.* at 479, 750 *A.2d* 73. Therefore, as a way to

harmonize the Legislature's policies as expressed in the forfeiture of public employment statute, *N.J.S.A.* 2C:51–2(d), with those found in the LAD and CEPA, we increased the threshold burden imposed on a plaintiff complaining of workplace discrimination if that plaintiff were barred by statute from holding the job at all.

█ Unlike the plaintiff in *Cedeno,* however, this plaintiff was not statutorily disqualified from the job with the Sheriff's Office. He was not a public employee at the time when he committed the underlying offense, and he was not subject to a forfeiture of future public employment.[6] Plaintiff therefore did not suffer from the absolute statutory ban on public employment that would have precluded him from being hired by the Sheriff's Office. Nevertheless, before we can address how the rule we announced in *Cedeno* applies to this plaintiff, we must consider whether plaintiff's expunged conviction would have prevented his employment if he had revealed it when he applied for his job.

█ Certainly the expungement statute itself provides that the information included in expunged records must be disclosed in conjunction with seeking employment in a law enforcement agency and that "such information shall continue to provide a disability as otherwise provided by law." *N.J.S.A.* 2C:52–27(c). However, nothing in this statute imposes an absolute bar on employment with a law enforcement agency. Were evidence of any expunged conviction sufficient to support such an absolute bar, the statute would so state. *Compare N.J.S.A.* 2C:51–2(d) (per se permanent disqualification from employment), *with N.J.S.A.* 2C:52–27(c) (pro-

---

[6] Plaintiff might not have been able to accomplish the expungement of these offenses had he been a public employee at the time they were committed and had he delayed in his application for the order. The expungement statute now includes a significant limitation, providing that "any crime committed by a person holding any public office, position or employment ... shall not be subject to expungement if the crime involved or touched such office, position or employment." *N.J.S.A.* 2C:52–2(b). Because this prohibition was added to the statute in 1993, *see L.* 1993, *c.* 301, however, it was not in effect in 1990 when plaintiff's conviction was expunged.

viding for disclosure of continued disability, but not per se permanent disqualification). It does not, but merely requires that the information be disclosed in those circumstances.

That distinction is important. If the statute requiring that the expunged offense be revealed were intended to operate as a complete ban on law enforcement employment, we would be constrained to conclude that had plaintiff revealed his expunged convictions, he would not have been hired by the Sheriff's Office at all. That, in turn, would require that we consider the effect of our decision in *Cedeno*, in light of its analysis of the policies underlying forfeiture, on plaintiff's claim. Because the statute does not so provide, we must consider the effect of plaintiff's failure to disclose the expunged offense in the context of the record and by relying on an analysis that is different from the one we employed in *Cedeno*.

## C.

We have not previously been called upon to consider either of the issues that defendants have raised concerning their use of after-acquired evidence. That is, we have not addressed the issue of whether after-acquired evidence that might have resulted in a discretionary decision not to hire an individual at all may be used to bar or limit damages for employment discrimination. Nor have we considered the relevance or uses of such evidence when plaintiff's claim is not limited to one for wrongful termination, but includes claims based on a hostile work environment.

The first of these questions, although it is both interesting and challenging, is one that we need not decide based on the record in this matter. First, unlike the facts of *Cedeno*, we are not confronted with an individual who was statutorily disqualified from being hired at all. As a result, had plaintiff revealed his expunged convictions in his application, he would not have been barred, by operation of law, from holding the position. That is to say, even in the face of his expunged arrest and conviction, plaintiff remained

eligible for employment with the Sheriff's Office; he was not permanently disqualified from that employment. ,

Second, there is no evidence in this record that suggests that plaintiff would not have been hired if he had revealed his expunged conviction in the application. Indeed, nothing in the record suggests that his prior offenses would have been viewed as sufficiently serious that, twenty years later, and having pursued a law-abiding life in the interim, he would not have been hired. The record includes no departmental hiring manual, no testimony, and no other evidence that the Sheriff's Office had any policy in the nature of a ban on hiring one who, like plaintiff, had a prior history of an expunged offense. In fact, the employment application neither referred to the expungement statute nor reminded applicants of their obligation to reveal an expunged conviction. In light of the paucity of the record on this point, we cannot conclude that the Sheriff's Office would have rejected plaintiff's application, on its face, had his prior expunged offense been revealed.

To the extent that defendants seek to extend the complete ban on recovery we announced in *Cedeno* to this plaintiff, they are unable to persuade us that it is appropriate to do so. Although in theory an employer who could demonstrate that it had a well-publicized, clear, explicit, and consistently-applied policy of refusing to hire any individual for a particular position [7] if that person had a previously expunged conviction of like magnitude might be able to argue that it should have the benefit of the *Cedeno* rule,

---

[7] Our analysis is similar to the reasoning of the Appellate Division in the context of an employer's use of after-acquired evidence to defend against a claim that it had discriminated against an employee by terminating her following her maternity leave. *See Crespo v. Evergo Corp.*, 366 *N.J.Super.* 391, 394–95, 841 *A.2d* 471 (App.Div.2004). During the pendency of the litigation, the employer discovered that the employee was an illegal alien and had presented a fraudulent social security card during the hiring process. *Id.* at 394, 841 *A.2d* 471. As such, the employer argued that she was, effectively, statutorily barred from being hired, entitling the employer to the benefit of *Cedeno*. In balancing the competing policies as expressed in the federal immigration statutes against the employee's right to be protected against discrimination, the panel concluded that all forms of relief were unavailable to the employee. *Id.* at 400–01, 841 *A.2d* 471.

nothing in this record remotely suggests that defendant Sheriff's Office could bear that heavy burden. We therefore need not consider this argument further.

We turn, then, to the central issue before us in this matter: whether, and to what extent, after-acquired evidence may bar or limit damages in a workplace discrimination or hostile work environment lawsuit. As to that issue, even if we were sympathetic to defendants' arguments, we would reject them in the unique context of this dispute. In contrast to the important policy considerations that motivated us to bar relief in *Cedeno*, there are no similarly weighty concerns on the employer's side of the scales here. Indeed, there is a significant difference between the effect that we would accord to after-acquired evidence of what others have dubbed "resume fraud" in a wrongful termination lawsuit and the effect, if any, it should have on a claim brought pursuant to the LAD for workplace discrimination or hostile work environment.

Rather, we view the question before us as unlike the one we considered in *Cedeno*. In considering this issue, we note that it is similar to one that our Appellate Division has previously encountered. *Taylor v. Int'l Maytex Tank Terminal Corp.-Bayonne*, 355 *N.J.Super.* 482, 810 *A.*2d 1109 (App.Div.2002). Concluding that after-acquired evidence of workplace misconduct could be used to limit plaintiff's economic damages, the panel rejected the argument that the doctrine could be extended to limit non-economic or punitive damages in a hostile work environment claim. The court stated:

> Unlike wage-based claims, a non-economic loss, such as emotional distress, if proven, relates to injuries that have no direct nexus to a plaintiff's status as an employee. Instead, they embody damages resulting from alleged misconduct of an employer, which, although directed at an employee, is nevertheless subject to redress because of indignities suffered, not because of the person's status as an employee. An employer who creates a hostile work environment should not be excused from responding in damages for personal injuries caused by its discriminatory conduct simply because it later learns that the injured employee did something in the past, which, if known at the time, would have caused his or her termination. The same rationale applies to claims for punitive damages, which are intended to deter especially egregious conduct, such as actual participation by upper management or willful indifference.

[*Id.* at 497–98, 810 *A.*2d 1109.]

Although this rationale was crafted in different circumstances, we echo it as an apt expression of the strong policy considerations that we here confront.

Defendants' contrary assertions are not persuasive. Under defendants' construct, if the after-acquired evidence of resume fraud is sufficiently severe that the individual would not have been hired in the first place, acts of discrimination or an atmosphere so "severe or pervasive" that it constitutes a hostile work environment, *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 606, 626 *A.*2d 445 (1993), even if entirely unrelated to the matters the individual failed to disclose in the application process, would, in effect, be without any remedy. The application of that construct would lead to abhorrent results: acts that our statutes condemn would be permitted; discriminatory behaviors, however vile and reprehensible, would go unpunished; victims of severe or pervasive discriminatory conduct or workplace harassment would be turned away from our courthouses without any avenue of redress.

We cannot imagine that our Legislature intended such an outcome. The broad language of the remedial purposes of the LAD as a mechanism to root out the cancer of discrimination, *see Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.*2d 652 (citing *Jackson v. Concord Co.,* 54 *N.J.* 113, 124, 253 *A.*2d 793 (1969)) (explaining that "the overarching goal of the [LAD] is nothing less than the eradication 'of the cancer of discrimination'"), *cert. denied,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988); *see also Raspa v. Office of Sheriff,* 191 *N.J.* 323, 335, 924 *A.*2d 435 (2007); *L.W. v. Toms River Reg'l Schs. Bd. of Educ.,* 189 *N.J.* 381, 399, 915 *A.*2d 535 (2007); *Tarr v. Ciasulli,* 181 *N.J.* 70, 80, 853 *A.*2d 921 (2004), does not permit such a conclusion. Instead, we discern in the LAD an expression of public policies that requires us to strike a new balance between the rights of the employee to be free from workplace discrimination and the rights of the employer to make legitimate hiring and firing decisions.

To be sure, consistent with the expungement statute, plaintiff should have disclosed his prior conviction when he applied for this law enforcement job. Notwithstanding his good faith reliance on the advice of his attorney that the expungement order meant that the convictions and arrests "had never happened" and need not be disclosed, the order itself refers generally to the statutory limits on that advice. His failure to do so, however, is irrelevant. Even if the Sheriff's Office would not have hired plaintiff in the first place, even if the Sheriff would have fired him upon learning of his prior conviction, plaintiff was entitled, during the period of time when he was employed, to be protected from discrimination and to serve in a workplace free from the hostility that he endured.

Our Legislature has followed a strongly protective path in its efforts to root out discrimination in the workplace. We do not discern in the LAD any hint that the acts we will not tolerate in the workplace are permitted nonetheless to be visited on this or any other plaintiff merely because the employer can now point to information that plaintiff failed to reveal and that, had it been disclosed, might have resulted in a decision not to hire him.

By the same token, however, we do not envision that our Legislature intended to condone resume fraud or similar misrepresentations of one's employment-related credentials; we do not conclude that such acts should go unpunished. Rather, we conclude that economic damages, including claims for backpay and front pay, may be limited based on the employer's discovery of the after-acquired evidence if the information would have resulted in termination. As the Supreme Court concluded in *McKennon*, such elements of damages are appropriately cut off or limited through the employer's use of such proofs. Therefore, plaintiffs who include claims for economic damages, including claims asserting such allegations as constructive termination, along with their non-economic damage claims, may find that the former are limited consistent with *McKennon* or extinguished consistent with *Cedeno*. Notwithstanding that possible limitation, however, the elements of damages that are so much a part of the remedies

available pursuant to the LAD, and for hostile work environment claims in particular, namely, emotional distress and, potentially, punitive damages, cannot in fairness be limited or barred based on such after-acquired evidence.

To summarize, because plaintiff faced no statutory bar on his employment with the Sheriff's Office, the *Cedeno* rule precluding an award of backpay or front pay does not apply to his claims. Nor does *Cedeno's* heightened threshold burden for a hostile work environment claim or similar harm suffered during employment apply to him. Furthermore, because there is no evidence that the Sheriff's Office had a well-publicized, clear, explicit, and consistently-applied policy of refusing to hire any individual who revealed a previously-expunged conviction like plaintiff's, the theory of *Cedeno* barring or limiting economic damages does not apply to plaintiff. Rather, we conclude that, to the extent that plaintiff seeks an award of economic damages, including backpay and front pay, the *McKennon* analysis governs this dispute. That is to say, if the defendant employer can bear its burden of proving that it would have terminated plaintiff as soon as it learned of this expunged conviction, then that date may be used to limit any backpay award and to eliminate any front pay award. Finally, however, regardless of whether defendant would have fired plaintiff upon learning of the expunged conviction, plaintiff is entitled to pursue his hostile work environment claim and to recover the full measure of his non-economic damages including, if appropriate, a punitive award. For these claims, the public policy considerations expressed by our Legislature in our anti-discrimination statutes weigh heavily in favor of permitting plaintiff to have his day in court. The principles we further through the LAD demand no less.

## IV.

We next consider that aspect of the Appellate Division's decision that reinstated the complaint against Sheriff Rochford and Undersheriff Dempsey personally. The panel did not address

in detail the basis on which it elected to do so, commenting only that the claims against Sheriff's Officers Marinelli and McWilliams individually could not stand. As to those defendants, the panel noted that they could not be liable under the LAD because they were co-employees and because they could not have aided and abetted their own acts. Beyond that, the panel commented that an employee who holds a supervisory position may be individually liable for acts of discrimination, presumably a reference to the panel's reinstatement of the complaint as against Rochford and Dempsey. We consider this issue in an effort to address the apparent confusion that has arisen in this area of our law.

The LAD provides, in relevant part, that "employers" are liable for acts of employment discrimination, and defines with specificity who is an employer for this purpose. *See N.J.S.A.* 10:5–12(a). At the same time, the LAD also includes a prohibition that goes beyond employers and provides that "[i]t shall be ... unlawful discrimination ... [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [under the LAD]...." *N.J.S.A.* 10:5–12(e).

We first considered the scope of an employer's liability under the LAD for a hostile work environment in *Lehmann, supra.* There, we held that an employer could be liable for acts of a supervisor in one of two ways. First, if that supervisor acted within the scope of his or her authority in circumstances in which the employer had delegated that authority, and if the LAD violation was aided by that grant of authority, the employer would be vicariously liable. *Lehmann, supra,* 132 *N.J.* at 619–20, 626 *A.*2d 445. Second, we concluded that:

> An employer may also be held vicariously liable for compensatory damages for supervisory sexual harassment that occurs outside the scope of the supervisor's authority, if the employer had actual or constructive notice of the harassment, or even if the employer did not have actual or constructive notice, if the employer negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims.
>
> [*Id.* at 624, 626 *A.*2d 445.]

We observed that these bases for an employer's liability, although grounded in agency principles, find their genesis in the recognition that an employer may be "tacitly approv[ing]" the supervisor's conduct. *Id.* at 623, 626 *A.*2d 445. We explained that:

When an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile .... [and] sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser.

[*Ibid.*]

In *Lehmann*, *supra*, we focused on the work environment and the liability to be attributed to an employer. We did not, however, conclude, and we did not contemplate, that the supervisor could be personally liable for his or her acts or failure to act. Nor did we consider the impact of the LAD's further prohibition on "aiding and abetting" as a separate ground for a finding of liability as against the supervisor individually. Rather, we looked to the acts of the supervisor in the context of establishing the employer's liability and imputed to the employer the acts or failure to act by a supervisor who knew or should have known of the hostile environment. We restated this concept thereafter, commenting that a supervisor has a duty to take both preventive and corrective action in the workplace to maintain an environment free from discrimination. *See Payton v. N.J. Tpk. Auth.*, 148 *N.J.* 524, 537, 691 *A.*2d 321 (1997) (explaining that "the efficacy of an employer's remedial program is highly relevant to both an employee's claim against the employer and the employer's defense to liability").

In part, we have recognized that "[a] supervisor has a unique role in shaping the work environment. Part of a supervisor's responsibilities is the duty to prevent, avoid, and rectify invidious harassment in the workplace." *Taylor v. Metzger*, 152 *N.J.* 490, 503, 706 *A.*2d 685 (1998). "An employer [through its supervisors] has a clear duty not only to take strong and aggressive measures to prevent invidious harassment, but also to correct and remediate promptly such conduct when it occurs." *Id.* at 504, 706 *A.*2d 685.

Indeed, for that reason we have found that a single racial epithet, uttered by a supervisor, might suffice to prove the existence of a hostile work environment, thus making the employer liable. *Id.* at 506–08, 706 *A.*2d 685.

We have also considered the relationship between acts of a supervisor and an employer's liability in the context of a claim for punitive damages. *See Cavuoti v. N.J. Transit Corp.*, 161 *N.J.* 107, 116–29, 735 *A.*2d 548 (1999). We expanded upon our observation in *Lehmann* that punitive damages are "to be awarded 'when the wrongdoer's conduct is especially egregious,' " by examining the role of a supervisor's acts as the basis for "egregiousness." *Cavuoti, supra,* 161 *N.J.* at 118, 735 *A.*2d 548 (quoting *Lehmann, supra,* 132 *N.J.* at 624, 626 *A.*2d 445 (quoting *Leimgruber v. Claridge Assocs.,* 73 *N.J.* 450, 454, 375 *A.*2d 652 (1977))). We analyzed the role of "upper management" for the purpose of identifying those supervisors who meet this definition. *See ibid.* Because actual participation in wrongful conduct by upper management, or its willful indifference to such conduct, is needed to support a punitive award against the employer, we considered the role of supervisors so as to delineate more clearly whether and when a supervisor's acts constituted the acts of upper management. *Id.* at 129, 735 *A.*2d 548 (citing *Rendine v. Pantzer,* 141 *N.J.* 292, 314, 661 *A.*2d 1202 (1995)).

Most recently, in addressing the analysis to be undertaken in a claim of hostile educational environment claims, we again reiterated that under the LAD an employer may be responsible for the acts or failures to act of a supervisor. *See L.W., supra,* 189 *N.J.* at 403, 915 *A.*2d 535. Specifically, we explained that an employer may be held liable for creating or maintaining a hostile work environment:

> (1) when the employer grants a supervisor authority to control the workplace and the supervisor abuses that authority to create a hostile environment; (2) when the employer negligently manages the workplace by failing to enact anti-harassment policies and mechanisms; or (3) when the employer has actual or constructive knowledge of the harassment and fails to take effective measures to end the discrimination.

[*Ibid.* (citations omitted).]

We have thus held that a supervisor's behavior, either through acts of omission or commission, may form the basis for a hostile work environment claim to be made against the employer and, depending upon the particular circumstances, that it may support a punitive damage award against the employer as well. Even so, the supervisor's part in the analysis was only that of the one whose acts or failings could be attributed to the employer for liability purposes.

■ However, we did not conclude that the supervisor could be individually liable for his or her acts apart from an aiding and abetting analysis. On the contrary, we have recently held that the plain meaning of the definition of employer in the LAD does not include a supervisor. *See Tarr, supra,* 181 *N.J.* at 83, 853 *A.*2d 921. Instead, individual liability of a supervisor for acts of discrimination or for creating or maintaining a hostile environment can only arise through the "aiding and abetting" mechanism that applies to "any person." *N.J.S.A.* 10:5–12(e); *see Herman v. Coastal Corp.,* 348 *N.J.Super.* 1, 27–28, 791 *A.*2d 238 (App.Div. 2002) (concluding that individual liability is limited to aiding and abetting by the supervisor).

We have held that the words aiding and abetting "require active and purposeful conduct." *Tarr, supra,* 181 *N.J.* at 83, 853 *A.*2d 921. As a part of our analysis, we cited with approval the language of the Third Circuit predicting that we would so hold, concluding that:

[I]n order to hold an employee liable as an aider or abettor, a plaintiff must show that " '(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.' "

[*Id.* at 84, 853 *A.*2d 921 (quoting *Hurley v. Atlantic City Police Dep't,* 174 *F.*3d 95, 127 (3d Cir.1999)).]

Here, the Appellate Division panel concluded that the two co-employees, Marinelli and McWilliams, were not liable for their

own acts of harassment. Without so holding, however, the panel apparently concluded that the aiding and abetting analysis only applied to those two co-employees, Marinelli and McWilliams, but that the supervisors, Sheriff Rochford and Undersheriff Dempsey, could be individually liable on some other, unspoken, basis.

Because the panel addressed the claims against the co-employees separately and did not independently analyze the claim relating to the purported individual liability of the two supervisors, we can only conclude that the court confused the significance of a supervisor's act as a basis for an employer's liability with the significance of those same acts for purposes of the supervisor's individual liability. In doing so, the panel erred. Regardless of how we would view their acts for purposes of establishing the employer's liability, because neither Sheriff Rochford nor Undersheriff Dempsey was plaintiff's "employer," *see Tarr, supra,* 181 *N.J.* at 83, 853 *A.*2d 921 (explaining meaning of employer as utilized in *N.J.S.A.* 10:5–12(a)), they can be individually liable only if they were themselves aiders and abettors. *See N.J.S.A.* 10:5–12(e).

■ The record on appeal contains no evidence that would support the conclusion that Sheriff Rochford or Undersheriff Dempsey could have been aiders or abettors. Although each undoubtedly had responsibility over the employees and over the workplace, and although there is evidence that they failed to act so as to protect plaintiff or effectively respond to his complaints of discrimination, their acts are imputed to plaintiff's employer, the Sheriff's Office, as a result of their status as supervisors. A different paradigm applies to plaintiff's efforts to hold them individually liable, however. Standing alone, the acts and failures to act that plaintiff attributes to the Sheriff and Undersheriff fall well short of the "active and purposeful conduct," *see Tarr, supra,* 181 *N.J.* at 83, 853 *A.*2d 921, that we have held is required to constitute aiding and abetting for purposes of their individual liability.

## IV.

The judgment of the Appellate Division reversing and remanding the matter as to defendant Morris County Sheriff's Office is affirmed; the judgment of the Appellate Division reversing and remanding the matter as to defendants Sheriff Edward Rochford and Undersheriff John Dempsey, individually, is reversed; and the order of the Law Division dismissing all claims as to Sheriff Rochford and Undersheriff Dempsey, individually, is reinstated.

*For affirmance/reversal/reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.